## SWISHER, STATE'S ATTORNEY FOR BALTIMORE CITY, ET AL. *v.* BRADY ET AL.

No. 77–653. Argued March 29, 1978—Decided June 28, 1978

BURGER, C. J., delivered the opinion of the Court, in which STEWART, WHITE, BLACKMUN, REHNQUIST, and STEVENS, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN and POWELL, JJ., joined, *post,* p. 219.

*George A. Nilson,* Deputy Attorney General of Maryland, argued the cause for appellants. With him on the brief were *Francis B. Burch,* Attorney General, and *Clarence W. Sharp* and *Alexander L. Cummings,* Assistant Attorneys General.

*Peter S. Smith,* by appointment of the Court, 434 U. S. 1007, argued the cause for appellees. With him on the brief were *Adrienne E. Volenik, Phillip G. Dantes,* and *Bruce A. Gilmore.**

---

*\*David C. Howard* filed a brief for the National Juvenile Law Center as *amicus curiae* urging affirmance.

*Paul Halvonik, pro se,* and *Laurance S. Smith* filed a brief for the State Public Defender of California as *amicus curiae.*

Mr. Chief Justice Burger delivered the opinion of the Court.

This is an appeal from a three-judge District Court for the District of Maryland. Nine minors, appellees here, brought an action under 42 U. S. C. § 1983, seeking a declaratory judgment and injunctive relief to prevent the State from filing exceptions with the Juvenile Court to proposed findings and recommendations made by masters of that court. The minors' claim was based on an alleged violation of the Double Jeopardy Clause of the Fifth Amendment, as applied to the States through the Fourteenth Amendment. The District Court's jurisdiction was invoked under 28 U. S. C. §§ 1343, 2281, and 2284 (as then written); this Court's jurisdiction, under 28 U. S. C. § 1253.

I

In order to understand the present Maryland scheme for the use of masters in juvenile court proceedings, it is necessary to trace briefly the history both of antecedent schemes and of this and related litigation.

Prior to July 1975, the use of masters in Maryland juvenile proceedings was governed by Rule 908 (e), Maryland Rules of Procedure. It provided that a master "shall hear such cases as may be assigned to him by the court." The Rule further directed that, at the conclusion of the hearing, the master transmit the case file and his "findings and recommendations" to the Juvenile Court. If no party filed exceptions to these findings and recommendations, they were to be "promptly . . . confirmed, modified or remanded by the judge." If, however, a party filed exceptions—and in delinquency hearings, only the State had the authority to do so—then, after notice, the Juvenile Court judge would "hear the entire matter or such specific matters as set forth in the exceptions *de novo*."[1]

---

[1] Rule 908 (e) was the sole authority for the use of masters in juvenile causes. The practice was not treated in Maryland statutes.

In the city of Baltimore, after the State filed a petition alleging that a minor had committed a delinquent act,[2] the clerk of the Juvenile Court[3] generally would assign the case to one of seven masters.[4] In the ensuing unrecorded hearing, the State would call its witnesses and present its evidence in accordance with the rules of evidence applicable in criminal cases. The minor could offer evidence in defense. At the conclusion of the presentation of evidence, the master usually would announce his findings and contemplated recommendations. In a minority of those cases where the recommendations favored the minor's position, the State would file exceptions, whereupon the Juvenile Court judge would try the case *de novo*.[5]

In 1972, a Baltimore City Master concluded, after a hearing, that the State had failed to show beyond a reasonable doubt that a minor, William Anderson, had assaulted and robbed a woman. His recommendation to the Juvenile Court judge reflected that conclusion. The State filed exceptions. Anderson responded with a motion to dismiss the notice of exceptions, contending that Rule 908 (e), with its provision for a *de novo* hearing, violated the Double Jeopardy Clause. The Juvenile Court judge ruled that juvenile proceedings as such were not outside the scope of the Double Jeopardy Clause.

---

[2] Maryland, like 39 other States, defines a delinquent act as one that, if committed by an adult, would violate a criminal statute. See statutes collected at McCarthy, Delinquency Dispositions Under the Juvenile Justice Standards: The Consequences of a Change of Rationale, 52 N. Y. U. L. Rev. 1093 n. 2 (1977).

[3] The official name of the court is Circuit Court of Baltimore City, Division for Juvenile Causes.

[4] In 1974, of 5,345 delinquency hearings conducted in the Juvenile Court, 5,098 were held before masters. The remaining 247 were assigned in the first instance to the judge.

[5] In 1974, the Juvenile Court judge conducted 80 *de novo*, or "exceptions," hearings in delinquency matters. All hearings before the judge were recorded.

He then held that the proceeding before him on the State's exceptions would violate Anderson's right not to be twice put in jeopardy and, on that basis, granted the motion to dismiss. The judge granted the same relief to similarly situated minors, including several who later initiated the present litigation.

The State appealed and the Court of Special Appeals reversed. *In re Anderson,* 20 Md. App. 31, 315 A. 2d 540 (1974). That court assumed, for purposes of its decision, that jeopardy attached at the commencement of the initial hearing before the master. It held, however:

> "[T]here is *no adjudication* by reason of the master's findings and recommendations. The proceedings before the master and his findings and recommendations are simply the first phase of the hearing which continues with the consideration by the juvenile judge. Whether the juvenile judge, in the absence of exceptions, accepts the master's findings or recommendations, modifies them or remands them, or whether, when exceptions are filed, he hears the matter himself de novo, there is merely a continuance of the hearing and the initial jeopardy. In other words, *the hearing,* and the jeopardy thereto attaching, terminate only upon a valid adjudication *by the juvenile judge,* not upon the findings and recommendations of the master." *Id.,* at 47, 315 A. 2d, at 549 (footnotes omitted; emphasis added).

On this basis, the court concluded that the *de novo* hearing was not a second exposure to jeopardy.

On appeal by the minors, the Court of Appeals affirmed, although on a rationale different from that of the intermediate appellate court. *In re Anderson,* 272 Md. 85, 321 A. 2d 516 (1974). It held that "a hearing before a master is not such a hearing as places a juvenile in jeopardy." Central to this holding was the court's conclusion that masters in Maryland serve only as ministerial assistants to judges; although author-

ized to hear evidence, report findings, and make recommendations to the judge, masters are entrusted with none of the judicial power of the State, including the *sine qua non* of judicial office—the power to enter a binding judgment.[6]

In November 1974, five months after the Court of Appeals' decision, nine juveniles sought federal habeas corpus relief, contending that by taking exceptions to masters' recommendations favorable to them the State was violating their rights under the Double Jeopardy Clause. These same nine minors also initiated a class action under 42 U. S. C. § 1983 in which they sought a declaratory judgment and injunctive relief against the future operation of Rule 908 (e). The sole constitutional basis for their complaint was, again, the Double Jeopardy Clause. A three-judge court was convened to hear this matter, and it is the judgment of that court we now review.

Before either the three-judge District Court or the single judge reviewing the habeas corpus petitions could act, the Maryland Legislature enacted legislation which, for the first time, provided a statutory basis for the use of masters in juvenile court proceedings. In doing so, it modified slightly the scheme previously operative under Rule 908 (e). The new legislation required that hearings before a master be recorded and that, at their conclusion, the master submit to the Juvenile Court judge written findings of fact, conclusions of law, and recommendations. Either party was authorized to file exceptions and could elect a hearing on the record or a *de novo* hearing before the judge. The legislature specified that the master's "proposals and recommendations . . . for juvenile causes do not constitute orders or final action of the court." Accordingly, the judge could, even in the absence of exceptions, reject a master's recommendations and conduct a *de*

---

[6] When the minors appealed here from this decision, we dismissed for want of a substantial federal question, *Epps* v. *Maryland*, 419 U. S. 809 (1974), and also denied certiorari, *Anderson* v. *Maryland*, 421 U. S. 1000 (1975).

*novo* hearing or, if the parties agreed, a hearing on the record. Md. Cts. & Jud. Proc. Code Ann. § 3–813 (Supp. 1977).

In June 1975, within two months of the enactment of § 3–813 and before its July 1, 1975, effective date, the single-judge United States District Court held that the Rule 908 (e) provision for a *de novo* hearing on the State's exceptions violated the Double Jeopardy Clause. *Aldridge* v. *Dean,* 395 F. Supp. 1161 (Md. 1975). In that court's view, a juvenile was placed in jeopardy as soon as the State offered evidence in the hearing before a master. The court also concluded that to subject a juvenile to a *de novo* hearing before the Juvenile Court judge was to place him in jeopardy a second time. Accordingly, it granted habeas corpus relief to the six petitioners already subjected by the State to a *de novo* hearing. The petitions of the remaining three, who had not yet been brought before the Juvenile Court judge, were dismissed without prejudice as being premature.

In response to both the enactment of § 3–813 and the decision in *Aldridge* v. *Dean, supra,* the Maryland Court of Appeals, in the exercise of its rulemaking power, promulgated a new rule, and the one currently in force, Rule 911, to govern the use of masters in juvenile proceedings.[7] Rule 911 differs from the statute in significant aspects. First, in order to emphasize the nonfinal nature of a master's conclusions, it stresses that all of his "findings, conclusions, recommendations or . . . orders" are only *proposed.* Second, the State no longer has power to secure a *de novo* hearing before the Juvenile Court judge after unfavorable proposals by the master. The State still may file exceptions, but the judge can act on them only on the basis of the record made before the master and "such additional [relevant] evidence . . . to which the

---

[7] At the time of its promulgation, the new Rule was numbered 910. As a result of recent nonsubstantive amendments and recodification, it received the 911 designation, by which it is referred to throughout this opinion.

parties raise no objection." [8]   The judge retains his power to accept, reject, or modify the master's proposals, to remand to the master for further hearings, and to supplement the record for his own review with additional evidence to which the parties do not object.[9]

---

[8] The juvenile, after filing exceptions, can still elect either a *de novo* hearing or a hearing on the record.

[9] Rule 911, in its entirety, provides:

"a. *Authority*.

"1. Detention or Shelter Care.

"A master is authorized to order detention or shelter care in accordance with Rule 912 (Detention or Shelter Care) subject to an immediate review by a judge if requested by any party.

"2. Other Matters.

"A master is authorized to hear any cases and matters assigned to him by the court, except a hearing on a waiver petition. The findings, conclusions and recommendations of a master do not constitute orders or final action of the court.

"b. *Report to the Court*.

"Within ten days following the conclusion of a disposition hearing by a master, he shall transmit to the judge the entire file in the case, together with a written report of his proposed findings of fact, conclusions of law, recommendations and proposed orders with respect to adjudication and disposition. A copy of his report and proposed order shall be served upon each party as provided by Rule 306 (Service of Pleadings and Other Papers).

"c. *Review by Court if Exceptions Filed*.

"Any party may file exceptions to the master's proposed findings, conclusions, recommendations or proposed orders. Exceptions shall be in writing, filed with the clerk within five days after the master's report is served upon the party, and shall specify those items to which the party excepts, and whether the hearing is to be *de novo* or on the record. A copy shall be served upon all other parties pursuant to Rule 306 (Service of Pleadings and Other Papers).

"Upon the filing of exceptions, a prompt hearing shall be scheduled on the exceptions. An excepting party other than the State may elect a hearing *de novo* or a hearing on the record. If the State is the excepting party, the hearing shall be on the record, supplemented by such additional evidence as the judge considers relevant and to which the parties raise

Thus, Rule 911 is a direct product of the desire of the State to continue using masters to meet the heavy burden of juvenile court caseloads while at the same time assuring that their use not violate the constitutional guarantee against double jeopardy. To this end, the Rule permits the presentation and recording of evidence in the absence of the only officer authorized by the state constitution, see *In re Anderson,* 272 Md., at 104–105, 321 A. 2d, at 526–527, and by statute, § 3–813, to serve as the factfinder and judge.

After the effective date of Rule 911, July 1, 1975, the plaintiffs in the § 1983 action amended their complaint to bring Rule 911 within its scope. They continued to challenge the state procedure, however, only on the basis of the Double Jeopardy Clause. Other juveniles intervened as the ongoing work of the juvenile court brought them within the definition of the proposed class. Their complaints in intervention likewise rested only on the Double Jeopardy Clause.

The three-judge District Court certified the proposed class under Fed. Rule Civ. Proc. 23 (b)(2) to consist of all juveniles involved in proceedings where the State had filed exceptions to a master's proposed findings of nondelinquency. That court then held that a juvenile subjected to a hearing before a master is placed in jeopardy, even though the master has no power to enter a final order. It also held that the

---

no objection. In either case the hearing shall be limited to those matters to which exceptions have been taken.

"d. *Review by Court in Absence of Exceptions.*

"In the absence of timely and proper exceptions, the master's proposed findings of fact, conclusions of law and recommendations may be adopted by the court and the proposed or other appropriate orders may be entered based on them. The court may remand the case to the master for further hearings, or may, on its own motion, schedule and conduct a further hearing supplemented by such additional evidence as the court considers relevant and to which the parties raise no objection. Action by the court under this section shall be taken within two days after the expiration of the time for filing exceptions."

Juvenile Court judge's review of the record constitutes a "second proceeding at which [the juvenile] must once again marshal whatever resources he can against the State's and at which the State is given a second opportunity to obtain a conviction." 436 F. Supp. 1361, 1369 (Md. 1977). Accordingly, the three-judge District Court enjoined the defendant state officials[10] from taking exceptions to either a master's proposed finding of nondelinquency or his proposed disposition.

We noted probable jurisdiction solely to determine whether the Double Jeopardy Clause prohibits state officials, acting in accordance with Rule 911, from taking exceptions to a master's proposed findings.[11] 434 U. S. 963 (1977).

---

[10] Defendants, appellants here, are the State's Attorney for Baltimore City, the operations chief of the State's Attorney's Office for Baltimore City, the Chief State Attorney assigned to the Baltimore City Juvenile Court, and the Clerk of that court.

[11] The State did not contend, either in the District Court or here, that appellees' suit for injunctive relief should be dismissed under the abstention doctrine of *Younger* v *Harris*, 401 U. S. 37 (1971). In these circumstances, we are not inclined to examine the application of the doctrine *sua sponte*. See *Ohio Bureau of Employment Services* v. *Hodory*, 431 U. S. 471, 477–480 (1977) ("If the State voluntarily chooses to submit to a federal forum, principles of comity do not demand that the federal court force the case back into the State's own system").

There is also a mootness question in this case. At the time of final argument before the District Court, Fields, the last in a series of intervening plaintiffs, was the only named plaintiff with a live controversy against the State. By that time, the State had either withdrawn its exceptions against the other named plaintiffs or completed the adjudicatory process by securing a ruling, one way or the other, from the Juvenile Court judge. After final argument, but before the District Court announced its decision, the State withdrew its exceptions to the master's proposals respecting Fields. Nevertheless, the District Court, at the outset of its decision, granted Fields' motion to intervene and certified the class. 436 F. Supp., at 1362.

We conclude that under the principles announced in *Sosna* v. *Iowa*, 419 U. S. 393 (1975), the State's action, with respect to the original named

## II

The general principles governing this case are well established.

> "A State may not put a defendant in jeopardy twice for the same offense. *Benton* v. *Maryland,* 395 U. S. 784. The constitutional protection against double jeopardy unequivocally prohibits a second trial following an acquittal. The public interest in the finality of criminal judgments is so strong that an acquitted defendant may not be retried even though 'the acquittal was based upon an egregiously erroneous foundation.' . . . If the innocence of the accused has been confirmed by a final judgment, the Constitution conclusively presumes that a second trial would be unfair.
>
> "Because jeopardy attaches before the judgment becomes final, the constitutional protection also embraces

plaintiffs and the intervenors, did not deprive the District Court of the power to certify the class action when it did and that, accordingly, a live controversy presently exists between the unnamed class members and the State. In *Sosna,* we observed:

"[T]here may be cases in which the controversy involving the named plaintiffs is such that it becomes moot as to them before the district court can reasonably be expected to rule on a certification motion. In such instances, whether the certification can be said to 'relate back' to the filing of the complaint may depend upon the circumstances of the particular case and especially the reality of the claim that otherwise the issue would evade review." *Id.,* at 402 n. 11.

Here the rapidity of judicial review of exceptions to masters' proposals creates mootness questions with respect to named plaintiffs, and even perhaps with respect to a series of intervening plaintiffs appearing thereafter, "before the district court can reasonably be expected to rule on a certification motion." *Ibid.*

In cases such as this one where mootness problems are likely to arise, district courts should heed strictly the requirement of Fed. Rule Civ. Proc. 23 (c) (1) that "[a]s *soon as practicable* after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained." (Emphasis added.)

the defendant's 'valued right to have his trial completed by a particular tribunal.' . . . Consequently, as a general rule, the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial." *Arizona* v. *Washington,* 434 U. S. 497, 503–505 (1978) (footnotes omitted).

In the application of these general principles, the narrow question here [12] is whether the State in filing exceptions to a master's proposals, pursuant to Rule 911,[13] thereby "require[s] an accused to stand trial" a second time. We hold that it does not. Maryland has created a system with Rule 911 in which an accused juvenile is subjected to a single proceeding which begins with a master's hearing and culminates with an adjudication by a judge.

Importantly, a Rule 911 proceeding does not impinge on the purposes of the Double Jeopardy Clause. A central purpose "of the prohibition against successive trials" is to bar "the

---

[12] The State contends that jeopardy does not attach at the hearing before the master. Our decision in *Breed* v. *Jones,* 421 U. S. 519 (1975), however, suggests the contrary conclusion. "We believe it is simply too late in the day to conclude . . . that a juvenile is not put in jeopardy at a proceeding whose object is to determine whether he has committed acts that violate a criminal law and whose potential consequences include both the stigma inherent in such a determination and the deprivation of liberty for many years." *Id.,* at 529. The California juvenile proceeding reviewed in *Breed* involved the use of a referee, or master, and was not materially different—for purposes of analysis of attachment of jeopardy— from a Rule 911 proceeding. See generally *In re Edgar M.,* 14 Cal. 3d 727, 537 P. 2d 406 (1975); cf. *Jesse W.* v. *Superior Court,* 20 Cal. 3d 893, 576 P. 2d 963 (1978).

It is not essential to decision in this case, however, to fix the precise time when jeopardy attaches.

[13] The District Court noted that Rule 911 differs from § 3–813, see *supra,* at 210–211, but concluded that under Maryland decisional law the Rule governs. 436 F. Supp., at 1365. The parties do not dispute the District Court's reading of state law. Accordingly, like the District Court, we consider only Rule 911 in resolving the constitutional challenge.

prosecution [from] another opportunity to supply evidence which it failed to muster in the first proceeding." *Burks* v. *United States*, 437 U. S. 1, 11 (1978). A Rule 911 proceeding does not provide the prosecution that forbidden "second crack." The State presents its evidence once before the master. The record is then closed, and additional evidence can be received by the Juvenile Court judge only with the consent of the minor.

The Double Jeopardy Clause also precludes the prosecutor from "enhanc[ing] the risk that an innocent defendant may be convicted," *Arizona* v. *Washington, supra,* at 504, by taking the question of guilt to a series of persons or groups empowered to make binding determinations. Appellees contend that in its operation Rule 911 gives the State the chance to persuade two such factfinders: first the master, then the Juvenile Court judge. In support of this contention they point to evidence that juveniles and their parents sometimes consider the master "the judge" and his recommendations "the verdict." Within the limits of jury trial rights, see *McKeiver* v. *Pennsylvania,* 403 U. S. 528 (1971), and other constitutional constraints, it is for the State, not the parties, to designate and empower the factfinder and adjudicator. And here Maryland has conferred those roles only on the Juvenile Court judge. Thus, regardless of which party is initially favored by the master's proposals, and regardless of the presence or absence of exceptions, the judge is empowered to accept, modify, or reject those proposals.[14]

Finally, there is nothing in the record to indicate that the procedure authorized under Rule 911 unfairly subjects the defendant to the embarrassment, expense, and ordeal of a second trial proscribed in *Green* v. *United States,* 355 U. S.

---

[14] It is not usual in a criminal proceeding for the evidence to be presented and recorded in the absence of the one authorized to determine guilt. But if there are any objections to such a system, they do not arise from the guarantees of the Double Jeopardy Clause.

184 (1957). Indeed, there is nothing to indicate that the juvenile is even brought before the judge while he conducts the "hearing on the record," or that the juvenile's attorney appears at the "hearing" and presents oral argument or written briefs. But even if there were such participation or appearance, the burdens are more akin to those resulting from a judge's permissible request for post-trial briefing or argument following a bench trial than to the "expense" of a full-blown second trial contemplated by the Court in *Green.*

In their effort to characterize a Rule 911 proceeding as two trials for double jeopardy purposes, appellees rely on two decisions of this Court, *Breed* v. *Jones,* 421 U. S. 519 (1975), and *United States* v. *Jenkins,* 420 U. S. 358 (1975).[15]

In *Breed,* we held that a juvenile was placed twice in jeopardy when, after an adjudicatory hearing in Juvenile Court on a charge of delinquent conduct, he was transferred to adult criminal court, tried, and convicted for the same conduct. All parties conceded that jeopardy attached at the second pro-

---

[15] Appellees also rely on *Kepner* v. *United States,* 195 U. S. 100 (1904). There a Manila lawyer was charged with embezzling the funds of his client. He was tried before the judge of a "court of first instance" and acquitted. The United States took an appeal to the Philippine Supreme Court, which, after reviewing the record, entered a judgment of guilty and imposed sentence. This Court held that an Act of Congress, which extended double jeopardy guarantees to the Philippines, required reversal of the conviction.

The differences between the present case and *Kepner* are material. There the trial judge was authorized to try serious criminal cases and to enter judgment, either of acquittal or conviction. The Philippine trial judge did not serve as an "assistant" or master of the Philippine Supreme Court for the purpose of making proposed findings to the appellate judges. *Id.,* at 115, 121, 133. Mr. Justice Brown in dissent accurately characterized the Philippine trial judge's role as embracing "the great and dangerous power of finally acquitting the most notorious criminals." *Id.,* at 137. The Philippine Supreme Court's role was appellate, and its jurisdiction was invoked by the Government's decision to appeal an otherwise binding judgment.

See also *Trono* v. *United States,* 199 U. S. 521 (1905).

ceeding in criminal court. The State contended, however, that jeopardy did not attach in the Juvenile Court proceeding, although that proceeding could have culminated in a deprivation of the juvenile's liberty. We rejected this contention and also the contention that somehow jeopardy "continued" from the first to the second trial. *Breed* is therefore inapplicable to the Maryland scheme, where juveniles are subjected to only one proceeding, or "trial."

Appellees also stress this language from *Jenkins:*

"[I]t is enough for purposes of the Double Jeopardy Clause . . . that further proceedings of some sort, devoted to the resolution of factual issues going to the elements of the offense charged, would have been required upon reversal and remand. *Even if the District Court were to receive no additional evidence, it would still be necessary for it to make supplemental findings* . . . . [To do so] would violate the Double Jeopardy Clause." 420 U. S., at 370 (emphasis added).

Although we doubt that the Court's decision in a case can be correctly identified by reference to three isolated sentences, any language in *Jenkins* must now be read in light of our subsequent decision in *United States* v. *Scott,* 437 U. S. 82 (1978). In *Scott* we held that it is not all proceedings requiring the making of supplemental findings that are barred by the Double Jeopardy Clause, but only those that follow a previous trial ending in an acquittal; in a conviction either not reversed on appeal or reversed because of insufficient evidence, see *Burks* v. *United States, supra;* or in a mistrial ruling not prompted by "manifest necessity," see *Arizona* v. *Washington,* 434 U. S. 497 (1978). A Juvenile Court judge's decision terminating a Rule 911 proceeding follows none of those occurrences. Furthermore, *Jenkins* involved appellate review of the final judgment of a trial court fully empowered to enter that judgment. Nothing comparable occurs in a Rule 911 proceeding. See n. 15, *supra.*

To the extent the Juvenile Court judge makes supplemental findings in a manner permitted by Rule 911—either *sua sponte,* in response to the State's exceptions, or in response to the juvenile's exceptions, and either on the record or on a record supplemented by evidence to which the parties raise no objection—he does so without violating the constraints of the Double Jeopardy Clause.

Accordingly, we reverse and remand for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN and MR. JUSTICE POWELL join, dissenting.

Appellees are a class of juveniles who, following adjudicatory hearings on charges of criminal conduct, were found nondelinquent by a "master." Because the State has labeled the master's findings as "proposed," the Court today allows the State in effect to appeal those findings to a "judge," who is empowered to reverse the master's findings and convict the juvenile. The Court's holding is at odds with the constitutional prohibition against double jeopardy, made applicable to the States by the Due Process Clause of the Fourteenth Amendment, *Benton* v. *Maryland,* 395 U. S. 784 (1969), and specifically held to apply to juvenile proceedings in *Breed* v. *Jones,* 421 U. S. 519 (1975).

The majority does not purport to retreat from our holding in *Breed.* Yet the Court reaches a result that it would not countenance were this a criminal prosecution against an adult, for the juvenile defendants here are placed twice in jeopardy just as surely as if an adult defendant, after acquittal in a trial court, were convicted on appeal. In addition to violating the Double Jeopardy Clause, Maryland's scheme raises serious due process questions because the judge making the final adjudication of guilt has not heard the evidence and may reverse the master's findings of nondelinquency based on

the judge's review of a cold record. For these reasons, I dissent.

# I

While the first inquiry in any double jeopardy case must be whether jeopardy has attached, see *Crist* v. *Bretz*, 437 U. S. 28, 32–33 (1978); *Serfass* v. *United States*, 420 U. S. 377, 388 (1975), I agree with the Court that jeopardy does attach at the master's hearing, *ante*, at 215 n. 12. In *Breed* v. *Jones*, *supra*, we held that jeopardy attaches "at a proceeding whose object is to determine whether [a juvenile] has committed acts that violate a criminal law." 421 U. S., at 529. The master's hearing clearly has this as an object. Under Maryland law, the master is empowered to conduct a full "adjudicatory hearing," in order "to determine whether the allegations in the petition . . . are true." Rule 914 (a); Md. Cts. & Jud. Proc. Code Ann. § 3–801 (b) (Supp. 1977); see Rules 911, 914 (f).[1] And it is at this hearing that the State intro-

---

[1] Thus, unlike a preliminary hearing (to which the State analogizes a master's hearing), where the inquiry is one of probable cause, the adjudicatory hearing conducted by the master is the beginning of the unitary process designated by the State of Maryland to determine the truth of the charges. The Maryland Court of Special Appeals has rejected the State's argument that masters' hearings are not adjudicatory:

"We think it within the clear contemplation of the Maryland law that the 'adjudicatory hearing' is that phase of the total proceeding whereto witnesses are summonsed [*sic*]; whereat they are sworn, confronted with the alleged delinquent, examined and cross-examined; whereat their demeanor is observed, their credibility assessed and their testimony . . . transcribed by a court reporter; whereat the alleged delinquent is represented by counsel and where he enjoys the right to remain silent . . . ; whereat the State's Attorney marshals and presents the [State's] evidence . . . ; and whereat the presiding judge or master makes and announces his finding . . . .

"Conversely, we think it . . . equally clear . . . that the 'adjudicatory hearing' is not that phase of the proceeding, frequently conducted *ex parte* and . . . *in camera*, whereat the supervising judge ratifies, modifies or rejects the finding and recommendations of the master." *In re Brown*, 13 Md. App. 625, 632–633, 284 A. 2d 441, 444–445 (1971).

Although the *Brown* opinion was rendered prior to Maryland's revision of

duces the evidence on which it seeks to have the determination of guilt or innocence rest. See *Serfass* v. *United States, supra,* at 389. See also *Crist* v. *Bretz, supra,* at 51–52 (POWELL, J., dissenting).

My disagreement with the Court lies in its misapplication of well-settled double jeopardy rules applicable once jeopardy has attached. As the Court itself recognizes, *ante,* at 214, the Double Jeopardy Clause "unequivocally prohibits a second trial following an acquittal," *Arizona* v. *Washington,* 434 U. S. 497, 503 (1978). Just as unequivocally, it prevents the prosecution from seeking review or reversal of a judgment of acquittal on appeal. *Kepner* v. *United States,* 195 U. S. 100 (1904). And even where the first trial does not end in a final judgment, the "defendant's valued right to have his trial completed by a particular tribunal," absent a " 'manifest necessity' " for terminating the first proceedings, is protected by this Clause. *Wade* v. *Hunter,* 336 U. S. 684, 689–690 (1949), quoting *United States* v. *Perez,* 9 Wheat. 579, 580 (1824); see *ante,* at 214–215.

These rules are designed to serve the underlying purposes of the Double Jeopardy Clause, the most fundamental of which is to protect an accused from the governmental harassment and oppression that can so easily arise from the massed power of the State in confrontation with an individual. See *Green* v. *United States,* 355 U. S. 184, 187 (1957). As the Court recognizes, the Double Jeopardy Clause serves to preclude the State from having " 'another opportunity to supply evidence which it failed to muster in the first proceeding' "; to avoid the risk that a defendant, though in fact innocent, may be convicted by a successive decisionmaker; and to prevent the State from unfairly subjecting a defendant "to the embarrassment, expense, and ordeal of a second trial." *Ante,*

---

its rules relating to the use of masters, see *ante,* at 209–210, the record before us indicates that the character of the hearing has not materially changed since that decision.

at 216. It is against these touchstones of law that the Maryland scheme must be evaluated.

## A

After rejecting the State's chief argument—that jeopardy does not attach in hearings before a master—the Court reaches its result primarily by ignoring the undisputed fact that state law commits to the master a factfinding function. Admittedly, the Maryland proceedings are somewhat difficult to classify into the customary pigeonholes of double jeopardy analysis, but that is precisely because the State has engaged in a novel redefinition of trial and appellate functions in a quasi-criminal proceeding, intentionally designed to avoid the constraints of the Double Jeopardy Clause.[2] While a State is, of course, free to designate a "master," a "judge," or some other officer to conduct juvenile adjudicatory hearings, our Constitution is not so fragile an instrument that its substantive prohibitions may be evaded by formal designations that fail to correspond with the actual functions performed.

Viewing the master and judge in terms of their relative functions, I think the appropriate analogy is between a trial judge and an appellate court with unusually broad powers of review. In the cases before us, the masters had made unequivocal findings, on the facts, that the State had not proved its case, and the State sought to have the judge overturn these findings.[3] By ignoring these functional considerations,

---

[2] In response to an earlier decision holding that a second hearing before the judge, when the State excepted to the master's findings of nondelinquency, violated the Double Jeopardy Clause, *Aldridge* v. *Dean,* 395 F. Supp. 1161 (Md. 1975), the State of Maryland modified its procedures to preclude a new hearing before the juvenile judge on the State's exceptions, unless both "parties" consent. See *ante,* at 210–211, 212. Following passage of these amended rules, the State moved to dismiss the instant proceeding as moot; the motion was denied.

[3] For example, in one instance, the State's case rested on the identification testimony of the victim of a bicycle theft. At the close of the

the Court permits the State to circumvent the protections of the Double Jeopardy Clause by a mere change in the formal definitions of finality. The Court thus makes the linchpin of its holding a formalism that belies our insistence that "courts eschew . . . 'label[s]-of-convenience . . . attached to juvenile proceedings,' *In re Gault,* [387 U. S. 1,] 50 [(1967)], and that 'the juvenile process . . . be candidly appraised,' [*id.,*] at 21." *Breed* v. *Jones,* 421 U. S., at 529.

## (1)

The Court describes the Maryland system as one permitting "the presentation and recording of evidence in the absence of the only officer authorized by the state constitution . . . and by statute . . . to serve as the factfinder and judge." *Ante,* at 212. It is inaccurate, however, to say that only the judge is "authorized" under Maryland law to act as a factfinder.[4] The master does not simply act as a referee at the hearing, deciding evidentiary questions and creating a record placed before the judge. Rather, Rule 911 directs that, at the end of the disposition hearing (which follows the adjudicatory hearing), the master "transmit to the judge the entire file in the case, together with a written report of his proposed findings of fact, conclusions of law, recommendations and proposed orders with respect to adjudication and disposition." Rule 911 (b).[5]

---

evidence, the master announced that, because he was not persuaded beyond a reasonable doubt of the accuracy of the witness' identification, especially since it was uncorroborated, he found the defendant not guilty. *In re McLean,* summarized in 8 Record, Petitioner's Exhibit No. 49, p. 16. On the State's exception, the juvenile judge convicted the defendant.

[4] It is not disputed here that, under the Maryland State Constitution, the State may validly delegate to masters authority to make proposed findings of fact under Rule 911.

[5] We therefore need not rely on appellees' statistical proof, convincing as it may be, to conclude that in Maryland masters are supposed to find facts. Appellees' evidence, however, supports this interpretation of Maryland law.

In Baltimore City in 1975 and 1976, there were seven masters and one

That Maryland contemplates an actual factfinding function for the master is emphasized by the fact that neither the Rule nor the statute requires the "judge" to read the entire record, listen to the tape recording of the adjudicatory hearing, or otherwise expose himself to the full factual record as it was presented to the master. Indeed, the Rule expressly recognizes that the judge may enter his order "based on" the master's findings. Rule 911 (d). The master himself thus serves as a factfinder of first instance; while his findings are only "proposed," they may be accepted by the judge without an independent review of the entire record.

---

Juvenile Court Judge. The District Court found that, except when the State filed an exception, all of the masters' recommended findings of non-delinquency had been approved by the judge. 436 F. Supp. 1361, 1364 (Md. 1977) (three-judge court).

Moreover, the first judge presented with appellees' double jeopardy claim—the state trial judge serving as the only Juvenile Court Judge in Baltimore from 1967–1975—agreed with the juveniles that permitting the State to take exceptions violated the Double Jeopardy Clause. His conclusion rested in part on his perception that

"it is impossible for the Judge . . . , who also carries a full docket of cases himself, to exercise any independent, meaningful judgment in the overwhelming majority of the many thousands of [masters'] orders put before him each year . . . . With this being the case it is difficult to see how realistically a Master can be called only an adviser . . . . [T]he Master conducts, for all intents and purposes, full blown and complete proceedings through the adjudicatory and dispositional phases and . . . as a practical matter he imposes sanctions and can effectively deprive youngsters of their freedom." *In re Anderson,* No. 158187 (Cir. Ct. Balt. City, Juv. Div., Aug. 1, 1973), p. 39.

The Juvenile Court Judge's decision was ultimately reversed on appeal. *In re Anderson,* 272 Md. 85, 321 A. 2d 516 (1974).

A report of the State Commission on Juvenile Justice in January 1977, after spending 18 months studying the Maryland juvenile courts, reached the same conclusion: "[W]ithout bearing legal responsibility for his decisions, the Master's recommended decisions become, in effect, final orders of the Court." Final Report of the Commission on Juvenile Justice to the Governor and General Assembly of Maryland 13 (1977).

(2)

In *Kepner* v. *United States*, 195 U. S. 100 (1904), we held that the Double Jeopardy Clause prohibited an appellate court in the Philippines from reversing a verdict of acquittal rendered by the trial court in a bench trial and entering a verdict of guilty.[6] The Government had argued that, under controlling Spanish law, "[t]he original trial is a unitary and continuous thing, and is not complete until the appellate court has pronounced judgment." Brief for United States, O. T. 1903, No. 244, p. 39. This Court, however, held that American constitutional law governed and that the Double Jeopardy Clause prohibited the Government from appealing a judgment of acquittal entered by the first trier of facts. In so holding, the Court rejected Mr. Justice Holmes' "continuing jeopardy" argument, 195 U. S., at 134–137 (dissenting opinion), an argument that we have consistently refused to adopt, see, *e. g.*, *United States* v. *Wilson*, 420 U. S. 332, 352 (1975), and to which the State's position here bears an uncomfortable resemblance.[7]

---

[6] In *Kepner*, the Court was technically construing an Act of Congress extending certain procedural protections to criminal trials conducted in the Philippines, which was a United States possession. However, the Court made clear that it construed the statutory language to incorporate the constitutional principles of double jeopardy, see 195 U. S., at 124, and its decision is thus properly regarded by the Court today as a constitutional one, see *ante*, at 217 n. 15.

[7] The Court explained the Spanish system of jeopardy, which the Government urged as applicable, as follows:

"Under that system of law . . . a person was not . . . in jeopardy in the legal sense until there had been a final judgment in the court of last resort. The lower courts were deemed examining courts, having preliminary jurisdiction, and the accused was not finally convicted or acquitted until the case had been passed upon in the . . . Supreme Court . . . . The trial was regarded as one continuous proceeding, and the protection given was against a second conviction after this final trial had been concluded in due form of law." 195 U. S., at 121.

The Court went on to make plain that this definition of finality of judg-

There are, of course, differences between *Kepner* and the instant case. In *Kepner* the court of first instance apparently had authority to enter an adjudication that would be final absent an appeal by either party, whereas here the masters do not have power to enter a final order of acquittal. But as we have repeatedly emphasized, an "acquittal" is not necessarily determined by the form of the order. *United States* v. *Martin Linen Supply Co.*, 430 U. S. 564, 571 (1977); see *United States* v. *Wilson, supra,* at 336; *United States* v. *Sisson,* 399 U. S. 267, 270 (1970). As the *Kepner* Court noted in support of its holding that a bench acquittal could not be appealed, a jury verdict of acquittal, even when not followed by a formal judgment of the trial court, bars further proceedings under the Double Jeopardy Clause. 195 U. S., at 130. Here, while the master does not formally make a final adjudication, in all other respects his proposed finding of nondelinquency is fully equivalent to an acquittal: after a plenary adjudicatory hearing, he makes "a resolution, correct or not, of some or all of the factual elements of the offense charged." *United States* v. *Martin Linen Supply Co., supra,* at 571. And the State's exception to the master's finding of nondelinquency engenders the same anxiety and burden as would a State's appeal from an adult court's verdict of acquittal.

The Court's rationale allows States to avoid the *Kepner* holding by the simple expedient of changing the definitions of finality without changing the functions performed by judges at different levels of decision. The decision today might well be read to hold that the Double Jeopardy Clause is no bar to structuring a juvenile justice system or, for that matter, an

---

ments of acquittal was inconsistent with our Double Jeopardy Clause. Thus it wrote that "[t]he court of first instance, having jurisdiction to try the question of the guilt or innocence of the accused, found Kepner not guilty; to try him again upon the merits, even in an appellate court, is to put him a second time in jeopardy for the same offense, if Congress used the terms as construed by this court in passing upon their meaning." *Id.,* at 133.

adult criminal justice system so as to have several layers of adjudication, none of which is final until the State has exhausted its last appeal.[8]   This proliferation of levels at which a defendant—juvenile or adult—must defend himself against an adjudication of guilt is precisely the kind of evil that the Double Jeopardy Clause was designed to forbid.   Yet under the Court's rationale, this is seemingly permissible so long as the State takes care to define the lower levels of decision-making as only "proposed" or "tentative" in nature, thereby commingling traditional trial and appellate functions.

## B

Even if the master's findings are not regarded as an acquittal, the Double Jeopardy Clause does more than simply protect acquittals from review on direct appeal.   It also protects the defendant's right to go to judgment before a "particular tribunal" once jeopardy has attached, absent a " 'manifest necessity' " justifying termination of the first proceeding. *Wade* v. *Hunter*, 336 U. S., at 689–690.   This rule is designed in part to ensure that the government not be able to bolster its case by additional evidence or arguments, once it believes that its evidence has not persuaded the first tribunal.   See *Arizona* v. *Washington*, 434 U. S., at 503–505, and n. 14.   But

---

[8] Thus, for example, a State might provide that in all bench trials, a judgment of acquittal does not become "final" for a certain amount of time in which an appellate court may review it.   While this is an unlikely eventuality, it points up the fallacy in the Court's reasoning.

Fortunately, the damage done by the Court's holding today is limited in its application by the Sixth Amendment right to a jury trial.   Not only would it offend the Double Jeopardy Clause for a jury's verdict of acquittal to be set aside (whether or not a judgment were entered on the verdict), see *United States* v. *Sanges,* 144 U. S. 310 (1892), cited in *Kepner* v. *United States,* 195 U. S., at 130, but it would also dilute the constitutional right to a jury trial in criminal cases.   The jury trial right has been held inapplicable to juvenile proceedings, however.   See *McKeiver* v. *Pennsylvania,* 403 U. S. 528 (1971).

the Maryland system is structured so as to give the State precisely this type of proscribed opportunity, where it disagrees with the favorable rulings of the first trier of fact.

As recognized by the Court, jeopardy attaches at the master's hearing. This hearing is a formal, adjudicatory proceeding at which the State's witnesses testify and are cross-examined; the juvenile may present evidence in his own defense; and the juvenile is entitled to counsel and to remain silent. Presentation of evidence at that proceeding is keyed to the reactions and attitudes of the presiding master, who acts, for purposes of the adjudicatory hearing, as the "particular tribunal." A juvenile who has had such a hearing may justifiably expect that, when the master who has heard all this evidence announces a finding in his favor, it will be final. But a juvenile tried before a master in Maryland is never, as a matter of law, entitled to have his trial "completed" before the master, since his recommendations must be confirmed by the judge and may be ignored by him.

Thus, endemic to the Maryland system is a kind of interrupted proceeding which ensures that the defendant cannot get the benefit of the first trier of fact's reaction to the evidence. The system thereby poses a substantial risk that innocent defendants may be found guilty, since it allows the State a second opportunity to persuade a decisionmaker of the juvenile's guilt, after the first trier of fact has concluded that the State has not proved its case. See *Ashe* v. *Swenson,* 397 U. S. 436, 446 (1970). Unless justified by a "manifest necessity"—not present here—the Double Jeopardy Clause condemns such a system. As we wrote in *Green* v. *United States,* 355 U. S., at 187–188, the "underlying idea" of the Double Jeopardy Clause

"is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him

to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty."

For these reasons, I conclude that the Maryland Rule, insofar as it permits a judge to review and set aside a master's findings favorable to the defendant on the facts of the case, violates the Double Jeopardy Clause.

## II

As the majority accurately states, the only issue raised in the complaints or focused upon in the parties' briefs was that of double jeopardy. It is argued by *amicus,* however, that the Maryland system, even if it were found to avoid double jeopardy problems, violates the Due Process Clause by permitting ultimate factfinding by a judge who did not actually conduct the trial.[9] The Court does not reach this issue, apparently believing that it is not properly presented here.[10]

---

[9] Brief of State Public Defender of California as *Amicus Curiae.*

[10] Although the Court does not reach this issue, cf. *Dandridge* v. *Williams,* 397 U. S. 471, 475–476, n. 6 (1970) (when "attention has been focused on other issues," remand may be appropriate), I believe it would be within its power to do so. See *Helvering* v. *Gowran,* 302 U. S. 238, 245 (1937) (Brandeis, J.). Affirming the judgment below on this ground would not have the effect of expanding the relief granted: an injunction against the State's taking of exceptions. See *United States* v. *New York Telephone Co.,* 434 U. S. 159, 166 n. 8 (1977). While the due process claim was not raised in appellees' complaints, it was argued in substance to the District Court in opposition to appellants' motion to dismiss the complaint. See Plaintiffs' Memorandum in Response to Motion to Dismiss 9 n. 29, 2 Record Exhibit 19; Plaintiffs' Memorandum in Opposition to Motion to Dismiss, 2 Record Exhibit 29. Moreover, appellees' brief here makes the following argument: "It is only logical to assume that if a case is tried before enough judicial officers, one of them will eventually conclude that the defendant is guilty beyond a reasonable doubt. . . . [S]uch a process would emasculate this Court's decision in *In re Winship,* 397 U. S. 358 (1970)." Brief for Appellees 86. While this is not identical to the due process argument urged by *amicus,* it illustrates the intimate

See *ante,* at 212, 213, 216 n. 14, 219.    It is thus important to emphasize that the Maryland system and ones like it have not been held constitutional today; the Court's only holding is that such systems are not unconstitutional under the Double Jeopardy Clause.    It is entirely open to this Court, and lower courts, to find in another case that a system like that in Maryland violates the Due Process Clause.

In *In re Winship,* 397 U. S. 358 (1970), we held that a juvenile accused of a crime may be convicted only upon proof beyond a reasonable doubt, even if he is prosecuted in a juvenile court.    The rationale of *Winship* suggests that the Due Process Clause requires the most reliable procedures to be used in making the reasonable-doubt determination in juvenile proceedings.    As we have repeatedly emphasized:

> " 'To experienced lawyers it is commonplace that the outcome of a lawsuit—and hence the vindication of legal rights—depends more often on how the factfinder appraises the facts than on a disputed construction of a statute . . . .    Thus the procedures by which the facts of the case are determined assume an importance fully as great as the validity of the substantive rule of law to be applied.' "    *Wingo* v. *Wedding,* 418 U. S. 461, 474 (1974), quoting *Speiser* v. *Randall,* 357 U. S. 513, 520 (1958).

Over 30 years ago, in *Holiday* v. *Johnston,* 313 U. S. 342 (1941), we recognized the importance to a reliable factfinding process of hearing live witnesses.    The issue there was whether, on a federal habeas corpus petition, a District Judge could utilize a United States Commissioner to hold the evidentiary hearing and make recommended findings of fact and conclusions of law.    Although our holding that the prisoner had a right to testify and present his evidence before a judge was a statutory one, our reasoning went to the fundamental nature

relationship between the double jeopardy and due process problems inherent in the Maryland scheme.

of the kind of factfinding on which many judicial determinations must rest:

> "One of the essential elements of the determination of the crucial facts is the weighing and appraising of the testimony. . . . We cannot say that an appraisal of the truth of the prisoner's oral testimony by a master or commissioner is, in the light of the purpose and object of the proceeding, the equivalent of the judge's own exercise of the function of the trier of the facts." *Id.*, at 352.

Four Terms ago, in *Wingo* v. *Wedding, supra,* we adhered to this view, holding that the successor habeas corpus statute also required the district judge personally to conduct evidentiary hearings in habeas corpus cases. We not only disapproved the practice of referring evidentiary hearings to masters, but also held that the judge's listening to an electronic recording of the testimony was no substitute for his personally hearing and observing the witnesses to evaluate their credibility.

These decisions arose in the context of habeas corpus proceedings, where the prisoner has the burden of demonstrating that he is being held in violation of the Constitution. In a criminal proceeding, where the issue posed is the threshold one of whether a defendant has been proved guilty of a crime beyond a reasonable doubt, the same considerations surely have at least as much force. Indeed, the need for achieving the most reliable determinations of evidentiary facts, and particularly of credibility, exists *a fortiori* where the factual determinations must be made beyond a reasonable doubt.

As the Maryland courts have held, *In re Brown,* 13 Md. App. 625, 632–633, 284 A. 2d 441, 444–445 (1971), and as is self-evident from the structure of Rule 911, the master's function at the hearing is, in large part, to assess the credibility of the witnesses. That function simply cannot be replicated by the "judge," acting in his essentially appellate capacity reviewing the record; as *amicus* cogently notes, "[t]rials-by-transcript can never be more than trials by substantial evi-

dence." [11] It would thus appear that the Maryland system of splitting the hearing of evidence from the final adjudication violates the Due Process Clause.

It is no answer to this problem that the juvenile defendant may elect to submit additional material to the judge when the State takes an exception to the master's finding. In the first place, the State apparently must agree to the supplementation of the record, and can thus stymie a defendant's efforts to persuade the judge that he is not guilty. See Rule 911 (c). But more importantly, when a juvenile seeks to reopen the proceeding before the judge—in order to avoid having a case decided against him on the basis of a cold record in violation of the Due Process Clause—he is being subjected to a second trial of the sort clearly prohibited by the Double Jeopardy Clause. The constitutionality of forcing a juvenile to such a choice between fundamental rights is questionable at best. Cf. *United States* v. *Jackson,* 390 U. S. 570 (1968); *North Carolina* v. *Pearce,* 395 U. S. 711 (1969).

### III

That the current Maryland scheme cannot pass constitutional muster does not necessarily mean that the idea of using masters, or some other class of specially trained or selected personnel for juvenile court adjudications, is either unconstitutional or unwise. Using masters to adjudicate the more common charges may save scarce judicial resources for the more difficult cases. It may also aid the ultimate goals of a juvenile justice system by ensuring that the decisionmakers have some familiarity with the special problems of juvenile dispositions. But the State must find a way of implementing this concept without jeopardizing the constitutional rights of juveniles. Whether it does so by endowing masters with the power to make final adjudications or by some other means,

---

[11] Brief for State Public Defender of California as *Amicus Curiae* 26.

matters not. What does matter is that, absent compelling circumstances not present here, the system of juvenile justice in this country must not be permitted to fall below the minimum constitutional standards set for adult criminal proceedings.

Accordingly, I dissent.