599 A.2d 458

**In re MICHAEL W.**

**No. 1369, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

Dec. 24, 1991.

Donna R. Heller, Asst. Atty. Gen., (J. Joseph Curran, Atty. Gen., Baltimore, on the brief), for appellant, Baltimore City Dept. of Social Services (Sherrie B. Glasser, Asst. Public Defender, Baltimore, on the brief), for appellant, Father.

Kathleen M. Brown, Assigned Public Defender, Towson, (Stephen Harris, Public Defender, Baltimore, on the brief), for appellee, Mother.

Zakia Mahasa, Baltimore, for appellee, Child.

Argued before GARRITY, BLOOM, and ROBERT M. BELL*, JJ.

GARRITY, Judge.

The Baltimore City Department of Social Services appeals from an order of the Circuit Court for Baltimore City (Brown, J.), sitting as juvenile court, wherein the court concluded that Michael W. was not a child in need of assistance (CINA)[1] pursuant to Md.Cts. & Jud.Proc.Code Ann. §§ 3–801, *et seq.* Appellant[2] presents the following issues for our review:

1. Whether a party who filed an exception to a master's recommended disposition, but not the adjudication, waived the right to have the court review the master's CINA recommendation.

2. Whether the lower court was clearly erroneous in concluding that Michael W. was not a child in need of assistance.

## I.

### *The Master's Hearing*

On August 4, 1989, eleven-month-old Michael W. was admitted to the University of Maryland Hospital for treatment of a spiral fracture to the right femur. The examining physician indicated that the injury was suspicious of child abuse. Neither the child's custodial mother nor his

---

* Bell, J., participated in the hearing of the case and the conference in regard to its decision but was appointed to the Court of Appeals prior to the adoption of the opinion by the Court.

1. CINA is the acronym for "child in need of assistance," defined by Md.Cts. & Jud.Proc.Code Ann. § 3–801(e) as a

 child who requires the assistance of the court because (1) [h]e is mentally handicapped or is not receiving ordinary and proper care and attention, and (2) [h]is parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and his problems provided, however, a child shall not be deemed to be in need of assistance for the sole reason he is being furnished nonmedical remedial care and treatment recognized by State law.

2. Michael W. joins appellant on the second issue.

maternal grandmother, with whom he lived, provided an explanation consistent with the severity of the injury. Four days later, on August 8, 1989, the Baltimore City Department of Social Services (hereinafter BCDSS) filed a CINA petition on behalf of Michael, who was placed in shelter care pending adjudication.

On October 10, 1989, the master held an adjudicatory hearing and recommended that BCDSS continue shelter care placement pending a disposition hearing. After the disposition hearing, the master filed, pursuant to Maryland Rule 911b, her report of proposed findings of fact, conclusions of law, and recommendations with the juvenile court. The master found that the mother's explanation of injury was inconsistent with the nature of the injury. She determined that the only consistent explanation was that of child abuse or neglect because of the severity of the injury and the lapse of time between its occurrence and discovery. The master recommended an adjudication of CINA[3] and that the child be placed in the custody and guardianship of Michael's father with liberal visitation to the mother provided that no significant or deliberate injury to the child occur during visitation.[4]

On February 22, 1990, Michael's mother filed an exception to the Master's proposed disposition and requested a *de novo* hearing on the issue. She did not contest, however, the CINA recommendation.

II.

*The Exception Hearing*

Dawn Miller, a child protective services specialist with BCDSS, testified that she had been assigned to the case in September 1989 to continue the abuse investigation, to

---

3. For a discussion of whether a CINA determination is properly a component of the adjudicatory phase of the proceedings, *see infra* pp. 620–622.

4. Prior to the injury, Michael's father had denied paternity.

monitor the family, and to provide services. Since the injury remained unexplained insofar as the agency was concerned, she believed Michael was at risk if he remained in his mother's home. While the mother was unable to relate the exact cause of the injury to Ms. Miller, she speculated that he may have twisted his leg while she was taking him out of his stroller, or while in the temporary care of a friend, or during the hospital's examination of his swollen leg. The maternal grandmother also was unable to provide Ms. Miller with a definitive explanation for the injury.

Ms. Miller further testified that returning the child to his mother at this time, even under an order of protective supervision, would not be in Michael's best interest because the Department would be unable to provide 24-hour monitoring of his safety.

Detective Cynthia Woolford of the Baltimore City Police Department's Child Abuse Unit conducted an investigation on the report of suspected abuse of Michael. The child's mother advised her that he may have been injured while trying to learn to walk or that his leg may have gotten caught when she was taking him from his stroller.

Dr. Larry Wissow, an assistant professor of pediatrics at the Johns Hopkins University School of Medicine, opined that at the time of the injury Michael would have experienced extreme pain and screamed in a manner different from other screams previously heard by the caretaker. The caretaker would more than likely have realized the injury immediately. Michael may have settled down within 20 minutes to half an hour, but the caretaker would have been further able to detect injury by the fact that the child would have had difficulty walking and would have experienced pain when the caretaker removed the child's clothes or removed him from the stroller. Spiral fractures, according to Dr. Wissow, usually occur from serious falls.

Michael's mother, who was fifteen years old when Michael was born, recalled that on August 3, 1989, her son had

awakened at 5:00 in the morning screaming and had been brought to her by the grandmother who had observed a knot on his leg. The grandmother administered Tylenol to the child and he went back to sleep. Michael again awoke at 9 a.m. The child's mother fed him and he went back to sleep. As he continued to experience discomfort that morning, the mother and grandmother took him to University Hospital. At the hospital, Michael was given a range of motion tests and x-rays and the examining physician advised the mother that the bone had been twisted.

The court concluded that the injury was caused by an accident and that Michael was not a child in need of assistance. The court returned custody of Michael to his mother.

### III.

### A.

### *The Statutory Scheme*

The Maryland Legislature has provided a comprehensive framework for the care and protection of children who are alleged to have been abused or neglected by their parents. *See generally,* Md.Cts. & Jud.Proc.Code Ann. § 3–801 *et seq.* The process begins when a local department of social services files a CINA petition alleging that a child requires the assistance of the court because he or she is not receiving proper care and attention and the parents are unable or unwilling to provide this care. §§ 3–801(e), 3–810, 3–812.

The purpose of a CINA proceeding is to protect children and promote their best interest. It is not intended to punish the parents, and the statute limits the juvenile court to orders designed to protect the child. A CINA proceeding is aimed at accomplishing this protective purpose by temporarily separating the child from his parents *or* by supervising the parents in raising their children.

*In re Rachel T.,* 77 Md.App. 20, 28, 549 A.2d 27 (1988) (citations omitted).

CINA proceedings are bifurcated: (1) an adjudicatory hearing, § 3–801(b); Maryland Rule 914; and (2) a disposition hearing, § 3–801(n); Maryland Rule 915; *see also In re Jertrude O.,* 56 Md.App. 83, 466 A.2d 885 (1983), *cert. denied,* 298 Md. 309, 469 A.2d 863 (1984) (recognizing the dual nature of the proceedings).

The juvenile court initially conducts an adjudicatory hearing to determine if the allegations in the petition are true. Cts. & Jud. Proc. §§ 3–801(b) and 3–819; Md.Rule 914. When a CINA petition is filed at the request of the local department of social services, the local DSS is a necessary party to the proceeding and presents to the court the evidence in support of the petition. § 3–812(g). Allegations that a child is in need of assistance must be proven by a preponderance of the evidence. § 3–819(d).

If the allegations in the petition are sustained, the court conducts a disposition hearing. The court then determines whether the child needs the court's assistance and, if so, the nature of the assistance. § 3–801(n).

A master for juvenile causes is authorized to conduct these proceedings. § 3–813(b); Md.Rule 911 a. The master is required to make written findings of fact, conclusions of law, and recommendations as to an appropriate order. § 3–813(b). The master's findings, conclusions, and recommendations, however, do not constitute orders or final action of the court. *Id.* The juvenile court retains the power to accept, reject, or modify the master's proposals, to remand to the master for further hearings, or to conduct a further hearing of its own, supplemented by additional evidence to which the parties do not object. Maryland Rule 911; *see also Swisher v. Brady,* 438 U.S. 204, 210, 211, 98 S.Ct. 2699, 2703, 2704, 57 L.Ed.2d 705 (1978).

### B.

Appellant presents the issue of whether the juvenile court had authority to reject a CINA determination made by the master. Appellant argues that the juvenile court in a

CINA proceeding does not have discretion to disregard a master's determination that a child is CINA where exception has not been taken to the recommended adjudication, but rather to the proposed disposition. Appellant posits that when exceptions are filed, only those matters to which specific exceptions have been taken are subject to modification by the juvenile court judge. On matters to which no party has excepted, appellant argues, in effect, that the court is bound by the master's recommendation.

The starting point for our analysis begins with an examination of the exception process in juvenile causes. Maryland Rule 911 c provides that "[a]ny party may file exceptions to the master's proposed findings, conclusions, recommendations or proposed orders." A party's exceptions must be in writing, specify the items to which the party excepts and indicate whether the hearing on the exceptions is to be *de novo* or on the record. *Id.* This rule limits the hearing to those matters to which exceptions have been taken.

In the case at hand, the mother filed a Notice of Immediate Exception and Request for an Immediate Hearing wherein she excepted to the proposed disposition. The notice was filed within the prescribed period. *See* Rule 911 c (exceptions shall be in writing, filed with the clerk within five days after the master's report is served upon the parties and shall specify those items to which the party excepts). Both Rule 911 c and § 3-813(c)[5] limit the exception hearing to those matters to which exceptions have been taken. Appellant contends, therefore, that the court was

---

**5.** The parties stipulated to the facts. There was some disagreement about the master's conclusion that Michael W.'s mother provided inconsistent explanation of how the injury occurred. Counsel for the mother maintained that the mother did not know how the injury occurred, rather than that she provided inconsistent explanations. *The court concluded that it would proceed to disposition and resolve the issue about the master's conclusion at a later time.* As we shall explain, we believe that the master's conclusion was a second-level fact, and the court was free to draw its own conclusion. *See infra* pp. 622–623.

without authority to reject the master's CINA determination. We are thus confronted with the question of whether a CINA determination is a component of the adjudicatory or disposition phase of the bifurcated proceeding.

The statutory purpose of the adjudicatory hearing is to ascertain whether the allegations in a CINA petition are true. At the disposition hearing, the court determines whether the child needs the court's assistance and, if so, the nature of the assistance. Section 3–801 of the Maryland Courts and Judicial Proceedings Code provides the following definitions:

(b) *Adjudicatory hearing.*—"Adjudicatory hearing" means a hearing to determine whether the allegations in the petition, *other than allegations that the child requires the court's assistance,* treatment, guidance or rehabilitation, are true.

. . . .

(n) *Disposition hearing.*—"Disposition hearing" means a hearing to determine:

(1) *Whether a child needs* or requires *the court's assistance,* guidance, treatment or rehabilitation; and if so

(2) The nature of the assistance, guidance, treatment, or rehabilitation.

Id. (Emphasis supplied).

The clear import of this language is that the CINA determination is an element of the disposition proceeding. Although no exception was taken specifically to the master's proposed recommendation that Michael W. be declared CINA, based on the aforesaid analysis, the court did not err when it addressed that issue. The term disposition, by definition, means a determination of a child's need for the court's assistance.[6]

---

6. During the 1976 session of the General Assembly, a proposed amendment to Md.Cts. & Jud.Proc.Code § 3–819 recommended that the determination of child in need of assistance be made at the conclusion of the adjudicatory hearing, as distinguished from the disposition hearing. *See* bill file for 1976 Md.Laws ch. 463 (H.B.969).

## C.

■ Having concluded that the exception was properly before the court, we turn now to the scope of the proceedings. The role of the court vis-à-vis the master was dealt with exhaustively in *Dominques v. Johnson,* 323 Md. 486, 593 A.2d 1133 (1991), and *Wenger v. Wenger,* 42 Md.App. 596, 402 A.2d 94 (1979), *cert. granted,* 286 Md. 755 (1979), *appeal dismissed per stipulation* (1980). In *Wenger* we emphasized the deference the court pays to the master's fact findings. The master has heard the witnesses, observed their demeanor, and was able to make judgments based on intangibles, not apparent in an aseptic record. *Id.* at 604, 402 A.2d 94. "The master's findings of fact from the evidence are prima facie correct and they will not be disturbed unless determined to be clearly erroneous." *Bar Ass'n v. Marshall,* 269 Md. 510, 515–516, 307 A.2d 677 (1973). In *Levitt v. Levitt,* 79 Md.App. 394, 398, 556 A.2d 1162, *cert. denied,* 316 Md. 549, 560 A.2d 1118 (1989), we said:

Deference will be accorded to the facts as found by the Master, but this only applies to "first-level" facts. First-level facts are those that answer the What?, Where? and How? questions. Deference is not accorded to "second-level" facts or to recommendations.... Second-level facts are conclusions and inferences drawn from first-level facts. A first-level fact would be that one or both parents used drugs. A second-level fact would be that that use did or did not affect [the child]. A recommendation would be a change or lack of change of custody. [Citation omitted.]

The 1976 Legislature, however, enacted the definitions of adjudication and disposition, now at issue, which clearly diverge from the proposed amendment. Also during the 1976 legislative session, the General Assembly deleted from § 3–820 of Cts. & Jud.Proc. language to the effect that the CINA determination is made at the end of the adjudicatory hearing. This omission coupled with the Legislature's having considered the proposed amendment and having adopted language to the contrary, leads us to conclude that the Legislature rejected the position which appellant urges us to adopt.

Likewise, in the context of a CINA proceeding, the court does not accord such deference to the master's CINA recommendation or proposed disposition of the case. A given set of circumstances does not lead to one conclusion, but rather may support a range of conclusions. The court may be guided, and no more, by the recommendations of the master. *Wenger*, 42 Md.App. at 604–605, 402 A.2d 94. In *Ellis v. Ellis*, 19 Md.App. 361, 365, 311 A.2d 428 (1973), we stated:

> Litigants ... are entitled to have their cause determined ultimately by a duly qualified judge of a court of competent jurisdiction. Md. Const., Art. IV, § 1; Md.Code, Art. 26, § 30; Md.Rule 71a. While the system of resorting to Masters is one of longstanding and undoubtedly has salutary effects resulting in the more expeditious dispatch of the judicial process, the system cannot supplant the ultimate role of judges in the judicial process itself. [Footnote omitted.]

*Ellis* stands for the proposition that a litigant has the right to an independent review by the court of the evidence and testimony taken before the master and the right to have the benefit of the court's judgment, as distinguished from the master's alone.

In the instant case, the court accepted the first-level facts found by the master and proceeded to conduct a disposition hearing *de novo* wherein additional facts were adduced.[7]

---

7. As this case does not present the situation of a court *sua sponte* rejecting a master's first-level fact finding, neither Cts. & Jud.Proc. Code Ann. § 3–813(c) nor Md.Rule 911 d is implicated. As to such first-level facts, the master had determined that, while in the custody and care of the mother and maternal grandmother, the infant suffered a spiral break of his right leg. Michael's mother did not know how the injury occurred. Although the child was fearful of one of her male friends, the mother left Michael with that friend for a short time. The mother did not provide the police with the address of this male friend. The mother had been enrolled in a parenting class but quit before completing the course. The mother lived with her own mother who acted as the child's primary caretaker while the mother went out and occupied her time with friends. The court, however, did not

As defined by Black's Law Dictionary (5th ed.), a hearing *de novo* means "a new hearing or a hearing for the second time, contemplating an entire trial in [the] same manner in which [the] matter was originally heard and a review of [the] previous hearing." A court entertaining a *de novo* hearing presides over the matter as a court of original and not appellate jurisdiction. *Id.* Thus, a *de novo* hearing by definition contemplates a hearing wherein additional facts may be adduced which are pertinent to the issues raised by the exception.

Crucially important to the disposition issue was that of the cause of Michael's injury—such actual cause not having been determined by the master. Indeed, the master could only speculate that, "the only consistent explanation would be child abuse or severe neglect, as this was a serious injury, which should have been noticed as it occurred, had little Michael been properly looked after and cared for."

From the outset of the *de novo* hearing conducted on April 5, 1990, it became clear—in response to an observation as to scope by counsel for the appellant—that although Charles Weisberg, counsel representing the mother, had raised an exception only to disposition, it was his belief, as explained to Judge Brown, that

> through a dispositional hearing, a full hearing will be had and the court will have a background of the case. I do believe we can stipulate to certain facts at this time, but I think there might be some difference between the facts proposed for stipulation as to those that were found in the recommendation of the master.

> \* \* \* \* \* \*

> If we proceed to disposition today, it will be necessary for all parties to bring out the alleged factual background of this case. That is part of the dispositional process. My wording may have been inaccurate in my request for

---

accept the second level fact finding by the master that, based on the above, the mother was neglectful.

Exception, but it is my belief we can cure that and leave to amend, we can do that through the ordinary process of a dispositional hearing....[8]

Upon being advised that the only portion of the matter to which all parties could agree was "just the fact the injury occurred and is unexplained," the court commenced a full hearing on disposition, which includes a determination as to CINA, without objection.

As the Department of Social Services had only one witness it could present that day, upon receiving the testimony of that witness, the court recessed and reconvened approximately a month and a half later on May 22, 1990. At that time, all witnesses were heard without testimonial restriction or objection.

The Department of Social Services relitigated the CINA issue and presented testimony and cross-examined as to the nature and cause of the injury. It presented the results of its investigation and medical testimony supporting its theory that the injury had been caused intentionally or by the mother's neglect. Indeed, it also presented testimony that the injury could have been caused by accident.[9] This testimony was all in addition to that produced on the disposition

---

8. Also, in the discussion as to scope of the hearing, counsel on behalf of Michael, Donna Purnell, advised, "we would let Mr. Weisberg ask for a hearing *de novo* on the entire matter...."

9. At one point in the proceedings, Detective Cynthia Woolford testified on behalf of the Department that she obtained a second medical opinion, and that Dr. Larry Wissow of Johns Hopkins Medical School related as to the cause of injury that, "It's a possibility it could have been an accident, but he could not say for one hundred percent that it was child abuse." At another point in the hearing, Kevin Carter, counsel for the Department of Social Services, proffered that Dr. Wissow

would testify that he was basically given one explanation as to the way the injury occurred and that was the mother was bringing the child out of the stroller and that as she was removing the child from the stroller that that was a possible way that the injury occurred ... He would testify that if that was the way the injury occurred, that it would have to be a very hard yank in order for the fracture to occur that bad.

issue, i.e., appellee's alleged lack of parenting skills, bonding, and the current acknowledgement of fatherhood.

The appellant complains, for the first time on appeal, that it was not put on notice as to the scope of the hearing.[10] It contends, "Instead, BCDSS limited the evidence presented to . . . whether Michael needed the court's assistance, and if so, the nature and extent of that assistance."

It is patently clear that all parties to the proceedings were well aware of the court's intention to conduct a full dispositional hearing in order to determine whether Michael was—as "recommended" by the master—a child in need of assistance. Because of the lack of objection by the appellant as to what the hearing would cover, a defect in procedure, if any, was waived. Accordingly, the court did not err in receiving additional evidence as to the CINA determination at the *de novo* hearing on disposition.

## IV.

 Finally, appellant contends that the lower court erred when it found that Michael W. was not CINA.

The court ruled that although it was indisputable that Michael W. sustained a broken leg while in the care of his mother, the injury was not the product of abuse or neglect. The court found that the injury occurred when Michael W., who had been sleeping with his grandmother, tried to extricate his leg from beneath the weight of an adult body which had rolled onto the eleven-month-old child.

While appellant complains that there is no evidence to support the court's finding, the record clearly established that Michael W. had been sleeping with his grandmother,

---

**10.** It is interesting to note that although appellant's trial counsel submitted a motion for reconsideration of judgment, counsel did so on the basis of sufficiency of evidence rather than any misunderstanding as to the scope of the hearing.

that he awoke crying and screaming at 5:00 a.m.,[11] that the child's reaction was consistent with that indicated by Dr. Wissow for such an injury, and that the child could not put weight on the leg, which had developed a hematoma and swelling.

It is not within the province of this court to weigh and evaluate conflicting evidence to determine its comparative value; we decide only whether there is any evidence legally sufficient to support the finding of the trier of facts. *Carling Brewing Co. v. Belzner,* 15 Md.App. 406, 291 A.2d 175 (1972). Our review of the record does not disclose that the trial court was clearly erroneous in making its fact-finding. Therefore, we will not set aside the judgment of the juvenile court judge. *In re Appeal No. 504,* 24 Md.App. 715, 332 A.2d 698 (1975).

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.

---

11. The child's mother testified that she had "never heard a cry like that before."