61 F.3d 1070
 64 USLW 2120
 Wayland GILLIAM, Jr., James Matthew Swain and Pamela Owings,
Petitioners--Appellants,
v.
James Lee FOSTER, Sheriff of Newberry County, Charles M.
Condon, Attorney General of South Carolina, and
James W. Johnson, Jr., Circuit Court
Judge of South Carolina,
Respondents--Appellees.
 No. 95-2334.
 United States Court of Appeals,
Fourth Circuit.
 July 28, 1995.
 
 ORDER
 On July 11, 1995, Petitioners presented an emergency motion to a panel of this court, seeking relief from an order of the district court denying their request to temporarily enjoin state criminal proceedings against them scheduled to begin Monday, July 17, 1995. Petitioners claim that the trial will violate their constitutional right not to be twice placed in jeopardy for the same offense. The panel heard oral arguments of counsel on Saturday, July 15, on an expedited basis. Following a conference at the close of the hearing, the panel denied Petitioners' request for relief--Judges Wilkinson and Luttig voting to deny and Judge Wilkins voting to grant. On the morning of July 17, Petitioners requested en banc reconsideration and a poll of the entire court was requested. Chief Judge Ervin and Judges Hall, Murnaghan, Wilkins, Hamilton, Williams, Michael, and Motz voted in favor of en banc consideration and of granting the requested temporary relief. Judges Russell, Widener, Wilkinson, Niemeyer, and Luttig voted against en banc consideration and granting the requested temporary relief. Accordingly, the poll of the court for en banc consideration has carried and the motion for relief from the decision of the district court denying the temporary restraining order is granted.
 Therefore, a temporary restraining order enjoining the state criminal proceedings until the district court rules on the merits of the habeas petition is hereby issued. As expeditiously as possible, the district court is directed to receive such evidence and take such testimony as necessary and to rule on the merits of Petitioners' habeas petition.
 DONALD RUSSELL, WIDENER, WILKINSON, WILKINS, NIEMEYER, and LUTTIG, JJ., have issued separate statements.
 WILKINS, Circuit Judge:
 
 
 1
 It is highly regrettable that this court is compelled to temporarily enjoin a state criminal proceeding that began on July 17, 1995. It is even more regrettable that we must act while that proceeding is in progress. Of course, the temporary stay should have been granted days ago by the district court or by a panel of this court after hearing the arguments of counsel last Saturday, July 15, 1995. Because the district court and the panel erred in failing to issue a temporary stay, we must act in a manner that undeniably causes disruption in the state proceeding. But, the issuance of a stay is the only means available to protect Petitioners' constitutional right, and under the present circumstances, the vindication of Petitioners' basic constitutional right far outweighs the temporary suspension of the state proceeding. Any temporary disruption of the state proceedings will be quickly remedied by an expedited hearing in the district court at which time it will have the opportunity to address on the merits for the first time the issues presented.
 
 
 2
 Although the relief sought is appropriate in only the most limited circumstances, the present situation is firmly encompassed within those narrow circumstances. First, it cannot be seriously disputed that the ongoing state criminal proceedings violate Petitioners' constitutional right not to be placed twice in jeopardy for the same offense. The substantive double jeopardy question presented is whether the state trial judge in an earlier state criminal trial exercised sound discretion in finding that manifest necessity existed for a mistrial. The undisputed facts demonstrate that the state trial judge acted without any rational justification in granting a mistrial. Second, given that Petitioners have asserted a strong double jeopardy claim, the only means by which their right not to be put to the burden, anxiety, and expense of enduring a second trial may be protected is to stay the state criminal proceedings until the district court may rule on the merits of Petitioners' habeas petition. Finally, the federalism concerns expressed in Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), do not counsel against the grant of relief under these circumstances.
 
 I. FACTS
 A. State Trial Proceedings
 
 3
 Petitioners were prosecuted in November 1994 on state charges; the State represents that the charges included murder (Petitioner Swain) and aiding and abetting (Petitioners Gilliam and Owings). It appears that there was no significant question concerning Petitioners' participation in the events; rather, the trial was focused on the issue of whether the actions leading to the victim's death had been taken in self-defense or had been provoked.
 
 
 4
 On the third day of trial, the State presented the testimony of Officer Counts of the South Carolina Law Enforcement Division. Officer Counts had been present at the scene soon after the shooting and could identify photographs of the scene and testify concerning the immediate investigation. On cross-examination, defense counsel asked Officer Counts whether there had been blood found at the scene. Officer Counts stated that he would have to look at photographs taken by a police photographer to refresh his memory. Defense counsel showed a group of photographs to the prosecuting attorney (Set 1)[1] and then handed them to the witness; as had other photographs (described as Sets 2 and 3), the photographs in Set 1 had been provided to the defense prior to trial. The prosecuting attorney--believing that the photographs were being offered into evidence--stated, "Without objection." The trial judge then inquired whether defense counsel was offering the photographs into evidence at that time, and defense counsel responded that he was using them only to refresh the officer's recollection. The prosecuting attorney noted that he had spoken prematurely.
 
 
 5
 Officer Counts subsequently testified from the photographs. He explained what they depicted and identified the position of various objects shown in the photographs. Officer Counts identified three locations on the ground where investigators had located what they believed to be drops of blood and had marked the location with yellow tape; he also marked on a diagram of the scene (which had been prepared by the prosecution and was already admitted into evidence) where the drops of blood were found. During the remaining testimony by Officer Counts, two other groups of photographs of the scene (Sets 2 and 3) were introduced into evidence by the defense without objection.
 
 
 6
 Following Officer Counts' testimony, the state trial judge recessed the proceedings for lunch, instructing the jury to leave all of the photographs and evidence that had been published while Officer Counts was testifying in the courtroom. During the lunch break, the court reporter discovered that the photographs in Set 1--which had not been introduced into evidence--had been placed on the jury rail in the stack along with the photographs in Sets 2 and 3--which had been properly introduced into evidence. Concerned that the jury may have been exposed to evidence that was not properly admitted, the trial judge brought this to the attention of counsel.
 
 
 7
 Although not citing any prejudice that may have resulted from the jury's viewing of the photographs, the prosecution immediately moved for a mistrial, blaming defense counsel for the error. The defense strenuously objected. It disagreed with the prosecuting attorney's suggestion that defense counsel had been responsible for placing the unadmitted photographs where the jury could view them. Moreover, defense counsel argued that a mistrial was completely unnecessary. Importantly, defense counsel offered to "recall [Officer Counts] and move [the photographs] into evidence," explaining that Officer Counts had already identified the photographs and had testified about them. Further, defense counsel stressed that even if the jury actually saw the photographs, there was no prejudice.
 
 
 8
 The state trial judge called the foreman of the jury to the courtroom and asked him whether, as far as he knew, the jury had looked at all of the photographs that had been in the stack on the jury rail before lunch. The foreman stated that as far as he knew, they had. The defense requested that the trial judge ask additional questions to ensure that the jury had in fact seen the unadmitted photographs, noting that it was entirely possible that the photographs had been placed in the stack on the railing during the lunch break since defense counsel recollected that they had been left in the witness box when the court recessed. The state trial judge, however, refused to do so and declared a mistrial over defense objection. The state trial judge stated that he had no choice but to grant a mistrial because the photographs had not been admitted, were not identified, and had not been testified to.
 
 
 9
 Defense counsel requested that the state trial judge ask the court reporter to read back Officer Counts' testimony because he, in fact, had identified the photographs and testified using them. Again, however, the state trial judge summarily declined to do so. At no point did the state trial judge indicate any awareness that possible double jeopardy concerns were implicated by the grant of a mistrial. And, neither the prosecution nor the state trial judge indicated that the photographs were in any way prejudicial to the State or the defense.[2]
 
 B. Post-trial State Proceedings
 
 10
 Thereafter, when a subsequent prosecution was brought, Petitioners moved the state trial judge to dismiss the charges against them on double jeopardy grounds, arguing that manifest necessity had not existed for the grant of the mistrial over their objections. The state trial judge denied the request, ruling that manifest necessity had existed for the grant of the mistrial. Although the state trial judge did not make a finding that the jury's having seen the photographs was prejudicial nor offer any possible explanation of how the jury's viewing the unobjectionable photographs actually might have been prejudicial to either the State or the defense, the state trial judge did refer to the incident at one point as a "prejudicial occurrence" and opine that he was "concerned about the origin of the prejudice." Without offering any explanation concerning why the photographs might be prejudicial, he explained that the mistrial had been necessary because he could not have foreseen whether the photographs would have been offered into evidence and, if so, whether they would have been admitted. The state trial judge did not address the fact that the State had offered no objection to the admission of the photographs or that the defense had offered to recall Officer Counts and formally move their introduction.[3]
 
 
 11
 Petitioners appealed this ruling to the South Carolina Supreme Court. However, that court dismissed the appeal as interlocutory under South Carolina law.
 
 
 12
 C. Federal Habeas Proceedings--District Court
 
 
 13
 Petitioners then filed this action in district court pursuant to 28 U.S.C.A. Sec. 2254 (West 1994),[4] claiming that the upcoming second trial violated their right not to be twice put in jeopardy for the same offense because no manifest necessity existed to support the grant of the mistrial in the first trial. The State responded that manifest necessity had existed for the mistrial to "alleviate prejudice" caused by the jury's consideration of unadmitted evidence; however, the State utterly failed to explain or identify what possible prejudice may have resulted. On June 29, 1995, Petitioners sought a temporary injunction or alternatively expedited consideration of their habeas petition.
 
 
 14
 On July 7, 1995, the magistrate judge issued a report and recommendation concluding that a temporary stay of the scheduled state court proceedings was appropriate because: Petitioners would suffer irreparable harm if the temporary relief was not granted; the balance of harms tipped decidedly in favor of Petitioners; Petitioners had demonstrated serious and substantial questions that were fair ground for litigation on the merits of their double jeopardy claim; and the public interest favored the grant of temporary injunctive relief.
 
 
 15
 On July 10, 1995, the district court conducted an expedited, non-evidentiary hearing of the motion for a temporary restraining order and adopted the majority of these recommended findings of the magistrate judge. However, based upon arguments raised for the first time, the district court determined that Petitioners had shown no likelihood of succeeding on their double jeopardy claim and therefore were not entitled to injunctive relief.
 
 The district court first concluded:
 
 16
 [T]he disputed photographs were more important than might first appear. From the argument of counsel at the hearing, the court was able to determine that the murder victim in this case had fired shots at one of the [Petitioners] shortly before or contemporaneously with the shot by which he was killed. Therefore, issues of provocation and self-defense are present in this case. One factor that is important in resolving these issues is whether one of the [Petitioners] was on the decedent's property or on the public roadway at the time he fired his weapon. The disputed photographs are close up photographs of the ground which show blood stains. Because of this, they could be used to more clearly document where the shooting occurred.
 
 
 17
 As noted by the district court, this conclusion was based only on purely speculative statements of the State's attorney, not on any evidence in the record: no testimony was taken on this issue; no evidentiary hearing was conducted; and a simple review of the photographs does not bear out the State's assertion. Significantly, although the district court concluded that the photographs could be used to demonstrate more clearly where the shooting had occurred, it did not find that the photographs were prejudicial, as opposed to simply relevant.
 
 
 18
 The district court further determined that defense counsel may have been attempting to place this evidence before the jury through the back door while retaining the right to make the last argument to the jury under a South Carolina procedural rule that permits the defense to make the last argument if it does not present evidence. This basis for the decision of the district court was also based only on a statement by a State's attorney and was not supported by any foundation in fact. This argument bordered on the spurious and has effectively been abandoned on appeal.
 
 
 19
 It is well-settled law in South Carolina that if the defense introduces any evidence, whether in its case or in the State's case, it loses the right to have the last argument. State v. Gellis, 158 S.C. 471, 155 S.E. 849, 855 (1930); State v. Battle, 304 S.C. 191, 403 S.E.2d 331, 333 (App.1991). Moreover, it is undisputed that the defense previously had offered other evidence that had been admitted without objection and had therefore lost its right to make the last argument before the incident with the unadmitted photographs occurred. Because this argument was raised for the first time at argument before the district judge, who ruled from the bench and entered a written order the following day, obviously neither the parties nor the court had had an adequate opportunity to consider this assertion.
 
 
 20
 D. Federal Habeas Proceedings--Circuit Court
 
 
 21
 After the district court denied their request for a temporary stay of the scheduled state criminal proceedings or expedited consideration of their habeas petition, Petitioners submitted to a panel of this court a request for emergency relief from the order of the district court. See Fed.R.App.P. 8. The panel heard oral arguments on Saturday, July 15, 1995, and following a conference at the conclusion of the hearing, denied the requested relief. Thereafter, review en banc was sought by Petitioners, and a majority of the active circuit judges voted in favor of granting temporary relief from the order of the district court.
 
 E. Ongoing State Criminal Proceedings
 
 22
 While the en banc poll of this court was proceeding, Petitioners' retrial began in state court. According to a supplemental filing submitted by Petitioners, during the course of the retrial the photographs at issue here were identified by the same Officer Counts, offered into evidence by the defense, and admitted without objection from the State. The prosecuting attorney subsequently raised an objection to the admission on the ground that the photographs were cumulative and confusing. The state trial judge overruled the objection. In a supplemental reply, the State confirmed that the basis for its objection to the evidence was that the photographs were cumulative and confusing. The parties also informed this court that the state trial judge who presided at the first trial and who is a named respondent in this litigation, sua sponte recused himself before the retrial began.
 
 II.
 A. Balance of Hardships
 
 23
 All parties have framed the question of the appropriateness of the requested relief in terms of the balancing of the hardships test employed in the federal courts of this circuit to decide whether preliminary injunctive relief should issue. See Blackwelder Furniture Co. v. Seilig Mfg. Co., 550 F.2d 189, 194 (4th Cir.1977).[5] With respect to that test, although the State offered token argument on factors other than the likelihood of success on the merits, it is essentially undisputed that the majority of the factors bearing on the appropriateness of the grant of injunctive relief favor our granting a temporary stay of the state criminal proceedings. The gist of this dispute is whether Petitioners have adequately demonstrated a likelihood of success on the merits. When, as here, the balance of harms tips decidedly in favor of the party requesting relief, a preliminary injunction should "be granted if the [party requesting relief] has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." Direx Israel, Ltd. v. Breakthrough Medical Corp., 952 F.2d 802, 813 (4th Cir.1991) (internal quotation marks omitted). Consequently, the first question before this court is a straightforward one--whether Petitioners have sufficiently demonstrated a likelihood of success on the merits of their claim that their rights under the Double Jeopardy Clause will be violated by a retrial.
 
 B. Double Jeopardy
 
 24
 It is well settled that in a jury trial jeopardy attaches when the jury is empaneled and sworn. Crist v. Bretz, 437 U.S. 28, 35, 98 S.Ct. 2156, 2160-61, 57 L.Ed.2d 24 (1978). Once jeopardy has attached, a defendant has a constitutional right to have a particular tribunal decide his guilt or innocence. Id. at 36, 98 S.Ct. at 2161.
 
 
 25
 The reasons why this "valued right" merits constitutional protection are worthy of repetition. Even if the first trial is not completed, a second prosecution may be grossly unfair. It increases the financial and emotional burden on the accused, prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted. The danger of such unfairness to the defendant exists whenever a trial is aborted before it is completed.
 
 
 26
 Arizona v. Washington, 434 U.S. 497, 503-04, 98 S.Ct. 824, 829-30, 54 L.Ed.2d 717 (1978) (footnotes omitted). For these reasons, a prosecutor is generally permitted only one opportunity to force a defendant to stand trial. Id. at 505, 98 S.Ct. at 830.
 
 
 27
 In certain circumstances, however, this right may be superseded, and a defendant may be retried after a mistrial has been granted, when "the public's interest in fair trials designed to end in just judgments" has been abridged. Wade v. Hunter, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949). The Supreme Court has concluded that only when there is a "manifest necessity" for a mistrial granted over a defendant's objection will the prosecuting authority escape the double jeopardy bar. Arizona v. Washington, 434 U.S. at 505, 98 S.Ct. at 830. "Manifest necessity" for the grant of a mistrial is not a mechanical standard; rather, it is a determination that must be made in the context of the specific difficulty facing the trial judge. Id. at 506, 98 S.Ct. at 830-31. And, while manifest necessity for a mistrial does not require that a mistrial be "necessary" in the strictest sense of the word, it does require a "high degree" of necessity. Id. Perhaps the clearest example of a situation in which manifest necessity exists for a mistrial is when a jury that has heard all of the evidence cannot reach a verdict. Id. at 509, 98 S.Ct. at 832. At the other extreme are situations in which a prosecuting attorney seeks a mistrial in order to have additional time to marshall evidence to strengthen the case against the defendant. Id. at 508, 98 S.Ct. at 831-32. Between these two extremes exists a spectrum of trial errors, some raising the specter of manifest necessity for a mistrial and others falling far short of creating a situation in which a mistrial is manifestly necessary. See id. at 510, 98 S.Ct. at 832-33.
 
 
 28
 In determining whether manifest necessity existed, a reviewing court must "accord the highest degree of respect to the trial judge's evaluation of the likelihood that the" circumstances giving rise to the mistrial would have affected the impartiality of the deliberations of the jury. Id. at 511, 98 S.Ct. at 833. Indeed, when some event creates the possibility that the jury may have been biased, the deference a reviewing court affords the trial judge who has the opportunity to observe the sequence of events in the context of the trial is at its zenith. Id. at 512-14, 98 S.Ct. at 833-35. The trial judge need not make an explicit finding of manifest necessity or articulate the factors that led to the exercise of his discretion, and his decision is not subject to attack when the record adequately discloses the basis for his ruling. Id. at 516-17, 98 S.Ct. at 836.
 
 
 29
 The deference owed to the trial judge, however, is not unlimited; in reviewing the decision to grant a mistrial this court has "an obligation to satisfy [itself] that ... the trial judge exercised sound discretion." Id. at 514, 98 S.Ct. at 835 (internal quotation marks omitted). When the grant of a mistrial by the trial judge amounts to an irrational or irresponsible act, he must be found to have abused his discretion in finding that manifest necessity for the mistrial existed. Id.
 
 
 30
 In Arizona v. Washington, the Supreme Court looked to several factors in determining that a state trial judge had exercised sound discretion in granting a mistrial. The Court noted that the trial judge had been presented with a situation in which the jury had been exposed to inadmissible and highly prejudicial material and that the trial court had not acted precipitously. Id. at 514-15, 98 S.Ct. at 835. Rather, the trial court expressed concern regarding the possible double jeopardy consequences of an erroneous declaration of a mistrial and heard extensive argument on the appropriateness of such a measure, including consideration of possible alternatives to the mistrial. Id. at 515-16, 98 S.Ct. at 835. The transcript of the state proceedings demonstrates that none of these factors were present here.
 
 
 31
 First, the state trial judge was not faced with a situation in which inadmissible material had been presented to the jury.[6] The unadmitted photographs were only pictures, taken by state investigators, of the same area of the crime scene, from a slightly different angle or shorter distance, as other photographs that were properly admitted: the photographs in Sets 1 and 2 showed the scene, including the same three pieces of yellow tape that Officer Counts testified marked what appeared to be drops of blood; the only difference between those sets of photographs was that the photographs in Set 1 showed the drops of blood within the yellow taped areas more clearly. At oral argument, after careful questioning from the panel, the State conceded that the photographs in Set 1 were properly admissible under South Carolina law and that, had the defense simply moved them into evidence, there would have been no error.[7]
 
 
 32
 The proceedings in this court have focused on whether the jury's consideration of these photographs created prejudice or biased the jury in some way. It cannot be disputed that as relevant evidence, the photographs had probative value. Nor can it be disputed that the photographs showed more clearly what appeared to be several drops of blood. But, the simple fact is that Officer Counts already had testified that there were three areas where what appeared to be drops of blood were discovered by investigators and that these areas had been marked by yellow tape. Further, Officer Counts had also identified on a crime scene overlay where these areas were located. Although the State conceded that there was nothing inherently prejudicial about the photographs and that the only "prejudice" resulting from the jury's having viewed them was that they had not been formally introduced, it maintained before this court that because Officer Counts had not testified concerning the photographs in Set 1, the defense might be able to mislead the jury concerning the location of the taped markings or the location of blood.[8] However, the mere fact that the State makes this representation does not necessarily make it so. Indeed, a simple review of Officer Counts' testimony and the photographs in Set 1 and 2 belies the State's claim and demonstrates instead that the photographs in Set 1 and 2 were cumulative, in all relevant respects as the State admitted before this court and argued to the trial judge in the second trial.
 
 
 33
 In any event, focusing on what possible use of the photographs the prosecution or defense may have made of the photographs during the later trial proceedings begs the question. In this context, the initial consideration in determining whether a mistrial is warranted is whether the jury has been biased in some way. There is simply no rational argument to be made that these cumulative, admissible photographs biased the jury. As the State conceded, the only error was in the fact that they had not technically been admitted into evidence.
 
 
 34
 Further, the state trial judge acted precipitously: he refused defense counsel's request to determine whether the jury had actually seen the photographs in question; he refused to determine whether Officer Counts had in fact identified the photographs by referring to his testimony; he refused simply to look at the photographs and rule on their admissibility; he refused to allow defense counsel's request to recall Officer Counts and formally move the photographs' admission into evidence; and he never evinced any awareness that the grant of a mistrial might implicate or deprive Petitioners of their constitutional right. The State conceded in argument before this court that there was nothing to prevent the state trial judge from simply allowing Officer Counts (who was under subpoena and available) to be recalled to have the photographs formally introduced, as defense counsel offered to do at the time. Without question, this would have cured the technical, and only, error that had occurred. Consequently, in the absence of any prejudicial error, the state trial judge refused to consider or implement an obvious and completely adequate course of action to correct any possible error in the jury having viewed cumulative evidence that had not been properly admitted.
 
 
 35
 This court has held that "[i]n order to determine if the mistrial was required by manifest necessity, the critical inquiry is whether less drastic alternatives were available." United States v. Shafer, 987 F.2d 1054, 1057 (4th Cir.1993). And, we have previously noted:
 
 
 36
 One major factor to consider in assessing the wisdom of the trial court's action is whether a mistrial was necessary. If obvious and adequate alternatives to aborting the trial were disregarded, this suggests the trial judge acted unjustifiably.
 
 
 37
 Harris v. Young, 607 F.2d 1081, 1085 n.4 (4th Cir.1979) (emphasis added), cert. denied, 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980); see also United States v. Sloan, 36 F.3d 386, 400 (4th Cir.1994) (even if the trial judge had a subjective, good faith belief that a mistrial was necessary, the granting of a mistrial is an abuse of discretion if the record does not support the trial judge's concerns); Shafer, 987 F.2d at 1057 ("If alternatives existed, then society's interest in fair trials designed to end in just judgments was not in conflict with the defendant's right to have the case submitted to the jury" and mistrial was not necessary) (internal quotation marks & citation omitted).
 
 
 38
 Under these circumstances, we conclude that Petitioners have made a strong showing indicating that the state trial judge abused its discretion and acted irresponsibly in granting the mistrial. The record permits no other reasonable reading. The jury was not exposed to any inadmissible evidence, and the photographs in Set 1 were cumulative in relevant respects of the other evidence. The state trial judge ignored an obvious and completely adequate alternative offered to remedy any error arising from the jury's consideration of the photographs. This being the case, it cannot be said that Petitioners have failed to demonstrate, at a minimum, "questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." Rather, even one who is not convinced on the present record that the state trial judge abused his discretion in granting the mistrial must conclude that the questions presented warrant a full hearing before the district court.
 
 
 39
 C. Protection of Petitioners' Double Jeopardy Rights
 
 
 40
 In most cases, a defendant's constitutional rights may be vindicated simply by overturning a conviction that is violative of those rights. When this is the case, a stay of state proceedings is not warranted even though it would avoid the violation of the defendant's constitutional rights altogether. In stark contrast, the right conferred by the Double Jeopardy Clause cannot fully be vindicated by post-conviction relief because it is a prohibition not only of multiple punishments, but also of multiple trials:
 
 
 41
 [T]he rights conferred on a criminal accused by the Double Jeopardy Clause would be significantly undermined if appellate review of double jeopardy claims were postponed until after conviction and sentence. To be sure, the Double Jeopardy Clause protects an individual against being twice convicted for the same crime, and that aspect of the right can be fully vindicated on an appeal following final judgment.... However, this Court has long recognized that the Double Jeopardy Clause protects an individual against more than being subjected to double punishments. It is a guarantee against being twice put to trial for the same offense. ... Consequently, if a criminal defendant is to avoid exposure to double jeopardy and thereby enjoy the full protection of the Clause, his double jeopardy challenge ... must be reviewable before that subsequent exposure occurs.
 
 
 42
 Abney v. United States, 431 U.S. 651, 660-62, 97 S.Ct. 2034, 2040-41, 52 L.Ed.2d 651 (1977) (first emphasis added); see also United States v. Jorn, 400 U.S. 470, 479, 91 S.Ct. 547, 554, 27 L.Ed.2d 543 (1971) (plurality); Green v. United States, 355 U.S. 184, 187, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957); United States v. Ball, 163 U.S. 662, 669, 16 S.Ct. 1192, 1194, 41 L.Ed. 300 (1896). Consequently, a stay of the state criminal proceedings is the only means to protect Petitioners' constitutional right.
 
 D. Younger Abstention
 
 43
 The members of the panel majority have expressed apprehension over the appropriateness of even temporarily staying the state criminal proceeding given the federalism concerns expressed in Younger v. Harris, 401 U.S. 37, 43, 91 S.Ct. 746, 750, 27 L.Ed.2d 669 (1971). However, on the narrow and unique circumstances presented here, Younger does not counsel in favor of abstention.
 
 
 44
 First, the State has not requested that we abstain from exercising jurisdiction or from granting the temporary relief requested; the State has not raised the Younger issue in the district court or before us.[9] The Supreme Court has indicated that when a state fails to raise the issue of abstention under Younger, and voluntarily chooses to submit to the federal forum, " 'principles of comity do not demand that the federal court force the case back into the State's own system.' " Swisher v. Brady, 438 U.S. 204, 213 n. 11, 98 S.Ct. 2699, 2705 n. 11, 57 L.Ed.2d 705 (1978) (quoting Ohio Bureau of Employment Servs. v. Hodory, 431 U.S. 471, 480, 97 S.Ct. 1898, 1904, 52 L.Ed.2d 513 (1977)). For this reason, the Court expressed an unwillingness to consider the possible application of the Younger doctrine when the State had failed to raise it. Because the State has failed to raise the Younger issue in these proceedings, it has voluntarily submitted to the authority of this court, and comity concerns are not implicated.
 
 
 45
 Moreover, it is not particularly surprising that the State has not raised Younger because a straightforward application of that doctrine does not foreclose this court from granting the temporary relief requested. The prohibition on a federal court enjoining state criminal proceedings set forth in Younger is not an absolute one. While unquestionably Younger prohibits federal courts from routinely interfering with state criminal proceedings, Younger recognized that it may be appropriate for federal courts to do so when there has been a "showing of bad faith, harassment, or any other unusual circumstance that would call for equitable relief." Younger, 401 U.S. at 54, 91 S.Ct. at 755 (emphasis added). A colorable double jeopardy claim is a preeminent example of one of the very few "unusual circumstances" justifying federal court intervention in a state proceeding. Mannes v. Gillespie, 967 F.2d 1310, 1312 (9th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 964, 122 L.Ed.2d 121 (1993); see Satter v. Leapley, 977 F.2d 1259, 1261 (8th Cir.1992); Showery v. Samaniego, 814 F.2d 200, 201 n. 5 (5th Cir.1987); Doe v. Donovan, 747 F.2d 42, 44 (1st Cir.1984) (per curiam); see also Willhauck v. Flanagan, 448 U.S. 1323, 1325, 101 S.Ct. 10, 11, 65 L.Ed.2d 1147 (Brennan, Circuit Justice 1980).[10] While federal court interference with ongoing state criminal proceedings should be undertaken in only the most limited, narrow, and circumscribed of situations, the facts before us present one such situation.[11]
 
 III.
 
 46
 In sum, with full cognizance and deep appreciation of the gravity of the temporary relief being ordered and a sincere aversion to the process and the result, I am compelled by the law to conclude that it is necessary.
 
 
 47
 ERVIN, C.J., and HALL, MURNAGHAN, HAMILTON, WILLIAMS, MICHAEL, and MOTZ, JJ., join this opinion.
 
 DONALD RUSSELL, Circuit Judge, dissenting:
 
 48
 The real issue in this case concerns a number of Kodak photographs of the scene of the crime. The photographs had blurs. Whether the blurs represented blood or not was a critical fact. The only proof that these blurs represented blood was the testimony of Officer Counts, who said that the blurs could be blood. Counts was no expert on blood or blood's possible appearance in a photograph. There is, however, a well recognized test--serology. The prosecution admitted this, as I read the record. The defense admitted it had not subjected the photographs to such a test. Without such a test, it could not be said with any assurance of certainty that the blurs on the photograph were blood. In the absence of such proof, it would have been highly prejudicial for the state judge to admit these photographs into evidence. The action of the state judge in finding that a mistrial was, in effect, "manifestly necessary" by the manner in which the photographs were gotten into the record is correct. I feel that this issue argues against any precipitate action in granting freedom to defendants whose guilt is so clear in a murder of gross heinousness. I dissent for these reasons.
 
 
 49
 WIDENER, J., joins this dissent.
 
 WIDENER, Circuit Judge, dissenting:
 
 50
 While I believe the record shows the descriptions to be euphemistic as they describe the attorney's acts as inadvertent or negligent in leaving the photographs where they could be, and were, seen by the jury, and although I believe that Judge Wilkinson's traffic light should be red rather than amber, I respectfully join the dissenting opinions of Judges Russell, Wilkinson, Niemeyer and Luttig.
 
 
 51
 I note that our order grants a request to "temporarily enjoin state criminal proceedings." Although the phrase government by injunction is ordinarily used in other context, I think our interference in the state criminal proceeding is no less.
 
 
 52
 DONALD RUSSELL, J., joins this dissent.
 
 WILKINSON, Circuit Judge, dissenting:
 
 53
 I join Judge Luttig's thorough dissenting opinion. I write simply to express my concern at the step that the en banc court has taken. The court has already wrought havoc in the state proceedings in this case. The federal petition has forced the state trial judge to recuse himself for no other reason than the fact that his ruling on the mistrial was placed in dispute by the federal habeas petition. In addition, attorneys have been arguing before this court questions with regard to the admission of evidence and the prejudicial nature of it at the very time the state proceedings were ongoing. Any observer would be pardoned for believing that this trial has proceeded on parallel state and federal tracks.
 
 
 54
 The en banc court has further stayed state proceedings and second guessed a state trial judge without argument and with precious little opportunity to review the disputed evidence, much less to understand it in the context of a total trial. This course of action runs counter to basic values of comity. The federal intervention itself comes on an issue that the state supreme court had dismissed as interlocutory. The disruption is also not without its practical consequences. Intervention on the part of this en banc court takes control of trials out of the hands of the state judiciary. After this ruling, any state judge would have to think twice before granting a mistrial, even where there is good reason to do so.
 
 
 55
 Here there was good reason. A mistrial was granted due to no fault of the prosecution. Defense counsel does not even contend that there was a hint of prosecutorial bad faith. Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). A trial judge was acting to protect nothing more than the integrity of evidentiary admissions. That process ensures a proper foundation is laid for the admission of evidence, and that the same is duly authenticated. It serves notice to all parties and participants in a trial of what is properly before the jury and what constitutes the record for appeal.
 
 
 56
 Here, defense counsel concededly put before the jury materials that had never been admitted into evidence. While there has been a prolonged dispute on the relevance and prejudicial effect of what was improperly admitted, the unsuitability of the question for federal habeas review at this point should be apparent. The bottom line is that we have undercut a state trial judge seeking to safeguard the most basic rule of evidence and we have permitted counsel to secure the dismissal of a murder prosecution as a result of counsel's own mistakes.
 
 
 57
 If the defendants had been acquitted, we would have an entirely different case. As it is, this grant of a mistrial is squarely governed by Arizona v. Washington, 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978), which contains no less than five separate warnings to the inferior federal courts to accord respect and deference to the difficult and discretionary decisions that the state trial bench must face. Judge Luttig has ably canvassed the Washington decision. I am fully in accord with his conclusion that it dictates our restraint. If the light before us is not red, it is at least the deepest amber, and the en banc court has ignored every one of its cautionary signals.
 
 
 58
 DONALD RUSSELL, WIDENER, NIEMEYER and LUTTIG, JJ., join this dissent.
 
 NIEMEYER, Circuit Judge, dissenting:
 
 59
 I find it most unfortunate that this court has chosen to intervene and enjoin a state criminal proceeding in the circumstances of this case. This action is a bold affront to the principles of comity and federalism, and one which manifests no deference to the discretion of the state trial judge and little confidence in the ability of the state judicial system to resolve the issues. Furthermore, the majority's action mechanically imposes the Double Jeopardy Clause without taking into account the nature of the protection and the competing interests involved. I dissent from this decision.
 
 
 60
 The double jeopardy protection granted by the Fifth Amendment prohibits a second trial "for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." Burks v. United States, 437 U.S. 1, 11, 98 S.Ct. 2141, 2147, 57 L.Ed.2d 1 (1978). The Supreme Court has explained, however, that a retrial because of trial error, as in the circumstances before us, does not violate the Double Jeopardy Clause:
 
 
 61
 [R]eversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government has failed to prove its case. As such, it implies nothing with respect to the guilt or innocence of the defendant.
 
 
 62
 Id. at 15, 98 S.Ct. at 2149. See also Lockhart v. Nelson, 488 U.S. 33, 40, 109 S.Ct. 285, 290, 102 L.Ed.2d 265 (1988). The Court has stated that the protection against affording the prosecution a second opportunity to supply evidence which it failed to present initially lies "at the core of the [Double Jeopardy] Clause's protections." Tibbs v. Florida, 457 U.S. 31, 41, 102 S.Ct. 2211, 2218, 72 L.Ed.2d 652 (1982). The public interest in obtaining one complete prosecution to judgment for a criminal offense, however, is also firmly protected in double jeopardy jurisprudence. See, e.g., Illinois v. Somerville, 410 U.S. 458, 463, 93 S.Ct. 1066, 1070, 35 L.Ed.2d 425 (1973) ("[t]he interests of the public in seeing that a criminal prosecution proceed to verdict ... need not be forsaken by the formulation or application of rigid rules that necessarily preclude the vindication of that interest").
 
 
 63
 The majority in this case determine that a mistrial declared by the state trial judge before completion of the trial--when photographs neither offered nor admitted into evidence were shown to the jury--was such an abuse of trial court discretion that the petitioner's writ of habeas corpus must be entered now to enjoin further prosecution. There can be no doubt that displaying to a jury photographs that have neither been offered nor been admitted into evidence is trial error. It was not extraordinary therefore for the trial judge to have concluded that a mistrial was appropriate when the jury saw evidence that had not been admitted, even though the evidence might have been admissible.
 
 
 64
 Beyond circumstances where a defendant has already been acquitted or might have been acquitted in the first trial because of the inadequacy of the government's evidence, the Supreme Court has been reluctant to deny the state the opportunity to prosecute a second trial. This is so even when the trial judge has granted a new trial too hastily or for reasons that were not entirely clear on the record. See Gori v. United States, 367 U.S. 364, 366, 81 S.Ct. 1523, 1525, 6 L.Ed.2d 901 (1961). In Gori, while commenting about the trial judge's declaration of a mistrial sua sponte during the direct examination of the government's fourth witness, the Supreme Court observed, "It is unclear what reasons caused the court to take this action, which the Court of Appeals characterized as 'overassiduous' and criticized as premature." Id. at 365-66, 81 S.Ct. at 1524-25. Despite that observation, the Court affirmed the retrial of the defendant, stating:
 
 
 65
 Where, for reasons deemed compelling by the trial judge, who is best situated intelligently to make such a decision, the ends of substantial justice cannot be attained without discontinuing the trial, a mistrial may be declared without the defendant's consent and even over his objection, and he may be retried consistently with the Fifth Amendment.... [W]e have consistently declined to scrutinize with sharp surveillance the exercise of that discretion.
 
 
 66
 Id. at 368, 81 S.Ct. at 1526. The decision to grant a mistrial rests in the discretion of the trial judge, and so long as that discretion is not abused, the state can re-prosecute the defendant. The Supreme Court instructs that the trial judge's judgment is entitled to "great deference" and must be accorded "the highest degree of respect." Arizona v. Washington, 434 U.S. 497, 514, 511, 98 S.Ct. 824, 835, 833, 54 L.Ed.2d 717 (1978).
 
 
 67
 In this case I believe that the majority have substituted their discretion for that of the trial judge to reach a different conclusion. That, however, is not the exercise appropriate under the jurisprudence of the Double Jeopardy Clause. Unless we can conclude, while according great deference and the highest degree of respect to the trial judge, that he abused his discretion in granting a mistrial, we should allow the countervailing public interest of permitting the state to bring the defendant to justice to control. When core evidence, depicting blood at the murder scene, is impermissibly presented to the jury through photographs never offered nor admitted into evidence, I cannot conclude that the trial judge could not automatically thereafter declare a mistrial. By substituting their judgment for that of the trial judge, the majority now put at risk any ability of the prosecution to bring to justice a defendant charged with murder. The double jeopardy protection does not reach so far. I therefore dissent. I also join the dissenting opinions of Judge Wilkinson and Judge Luttig.
 
 
 68
 DONALD RUSSELL, WIDENER, WILKINSON and LUTTIG, JJ., join this dissent.
 
 LUTTIG, Circuit Judge, dissenting:
 
 69
 In an extraordinary decision, this court has just stayed a state trial of three defendants charged with murder and lynching, literally while the jury is hearing testimony. I dissent.
 
 
 70
 In my view, the majority has thrust itself into the affairs of the State of South Carolina in disregard of Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and has, in violation of the plain command of Arizona v. Washington, 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978), substituted its view for that of the state trial and federal district courts on the quintessential discretionary issue of whether unadmitted crime scene photographs inadvertently placed before the jury by defense counsel necessitated a mistrial. Except possibly for the three members of the court who heard argument on the stay motion for two and one-half hours on Saturday morning, no member of the en banc court has, to my knowledge, even had an opportunity to see the photographs that the court now finds as a matter of fact were likely so innocuous in the overall context of this trial that the state court's grant of mistrial was irrational.
 
 
 71
 Other than this decision, I am unaware of even a single instance post- Younger in which a federal court of appeals has stayed a state criminal trial in progress on the grounds of a double jeopardy claim, much less reversed a state trial court and federal district court in order to do so. Even assuming that staying an ongoing state criminal trial (as opposed to one that is merely pending) is a permissible exercise of the federal judicial power, it would seem obvious that that power should not be exercised where, as here, there is no suggestion of prosecutorial or judicial misconduct, the error was committed by defense counsel, and, as found by both the state trial court and the federal district court, the inadvertent submission of the photographs to the jury raises a distinct possibility of prejudice. If under any circumstances, then under these, Younger v. Harris and Arizona v. Washington dictate that the balance be struck in favor of deference to the State of South Carolina and its courts, and that recourse for any possible double jeopardy violation await state and federal review on direct and habeas appeal from final conviction. The utter disruptive effect of this court's intercessions in this state proceeding over the past week is already evident. Not only has much of counsels' trial time been consumed with assorted motions, replies and arguments to this court, but we were informed only yesterday that the original trial judge has, without explanation, recused himself from the trial of this matter. This is precisely why faithful adherence to Younger and Arizona is imperative if there is to be an orderly administration of justice in a system of dual sovereigns.
 
 I.
 
 72
 The facts that prompt the majority's decision to stop this murder trial in mid-course are revealing of the extent to which the court, in my view, has transgressed the boundaries of appropriate federal judicial authority.
 
 
 73
 On December 5, 1994, defendants' trial for murder and other charges began. On the third day of trial, the State presented the testimony of Officer Counts, who had been present at the crime scene and could identify crime scene photographs. During the defendants' cross-examination, Officer Counts was shown what is thought to be the photographs at issue in this case. Defense counsel, however, never moved for the admission of the controverted photographs. Although the prosecution initially stated that it had no objection to the photographs, it thereafter withdrew its acquiescence when defense counsel stated that the defense was not seeking to admit the photographs. After Counts finished testifying, the trial court recessed for lunch.
 
 
 74
 Upon returning from lunch, the trial judge discovered that defense counsel, probably inadvertently, had placed before the jury the unadmitted photographs that presumably were shown to Counts and that are at issue in this appeal. The State thereafter moved for a mistrial. The trial court gave all parties what he later described as a "full opportunity to explain their positions," Amended Order of May 15, 1995, at 4, and after considering and rejecting the alternatives suggested by defense counsel, declared a mistrial.
 
 
 75
 On March 6, 1995, defendants filed a motion in state court arguing that double jeopardy barred retrial. In an order dated May 15, 1995, the state court rejected the double jeopardy claim, finding that "manifest necessity" required the declaration of a mistrial. In so doing, the court made a specific finding of prejudice to the government as a result of defense counsel's actions, id. at 4, 5, and explained in detail why it rejected the alternatives of a curative instruction or a recall of the witness to allow defense counsel to introduce the photographs. After the South Carolina Supreme Court dismissed defendants' appeal without prejudice as interlocutory, defendants sought federal habeas review as well as a stay of state criminal proceedings to allow the district court to adjudicate the double jeopardy claim.
 
 
 76
 On July 10, 1995, the district court, after oral argument, denied the defendants' request for a stay. The district court found that the defendants "have virtually no likelihood of success on the merits of their double jeopardy claim." Order at 7. The court specifically determined that the trial judge had found that defense counsel was responsible for the jury viewing unadmitted photographs and that the trial was terminated due to "manifest necessity." The district court denied the motion for a stay on the specific grounds of possible prejudice to the government. The court found:
 
 
 77
 [I]ssues of provocation and self-defense are present in this case. One factor that is important in resolving these issues is whether one of the Defendants was on decedent's property or on the public roadway at the time he fired his weapon. The disputed photographs are close up photographs of the ground which show blood stains. Because of this, they could be used to more clearly document where the shooting occurred.
 
 
 78
 Id. at 5.
 
 
 79
 The defendants appealed this order to a panel of the Fourth Circuit. On Saturday, July 15, 1995, the panel held a two and one-half hour hearing at which both the government and defense counsel candidly answered the panel's questions. During this argument, the reasonableness of the district court's decision to grant a mistrial became even more apparent. Upon pointed questioning from the panel, defense counsel all but conceded that the unadmitted photographs were prejudicial to the government's case because they are close-ups of the crime scene which, due to the visibility of what appears to be blood at the particular location depicted, support the defense theory of self-defense or provocation.
 
 
 80
 In response to the panel's questions, the State initially said that the photographs were not "inherently prejudicial." But as became clear upon further questioning, the State had misunderstood the initial question. The State explained in response to a follow-up question that it meant by its earlier response that the photographs were not "inflammatory" on their face, that is, the photographs would not incite the passions of the jury. The State then went on to explain in painstaking detail precisely how the photographs could prejudice its case. Specifically, it explained that the close-up crime scene photographs that were inadvertently placed before the jury--the only close-up photographs ever seen by the jury--actually tended to confirm the existence of blood at the location, whereas one could not confirm from the admitted photographs that blood existed at that location. This is because the unadmitted photographs show several small red dots that are not visible on any of the admitted photographs. As the State explained in its supplemental filings, these dots, which appear to a casual observer to be blood, have never been tested by a serologist to confirm that they are in fact blood. Thus, the government's case could easily be prejudiced by the jury's natural but potentially erroneous belief that the dots are blood. And, as both parties concede, the presence or absence of blood at that precise location is central to the case, given the defenses of provocation and self-defense. The defense counsel candidly admitted at the hearing that it was for this very reason that the photographs were important to its case and for this reason that the defense wanted the photographs before the jury.
 
 
 81
 At argument, the defense made much of its belief that the unadmitted photographs would have been admissible through a recall of Officer Counts, and, upon questioning from the panel, the State likewise speculated that the photographs would be admissible under South Carolina law. This speculation by the parties, however, is of no moment, since the ultimate determination of admissibility rests with the trial judge and must be made with an appreciation of the whole trial and whether the photographs would be unduly prejudicial. The parties simply are not in a position to know whether the photographs would have been admissible. The trial judge, both immediately prior to declaring a mistrial and in his later decision rejecting the defendants' double jeopardy claims, specifically noted his concerns about the admissibility of the evidence and the need to make a determination of admissibility contemporaneously with the offering of evidence.
 
 
 82
 Finally, defense counsel maintained that any prejudice could have been cured by limiting instructions from the court to the jury. This is the identical argument that was made in Arizona, and, as the Court there held, although some trial courts might choose that route, that alternative is not mandated and a trial court's decision to declare a mistrial instead must be accorded "the highest degree of respect." 434 U.S. at 511, 98 S.Ct. at 833. The state trial court quite reasonably could have concluded, and undoubtedly did, that if the jury saw the photographs before the foundation testimony for their admission, it might be predisposed to misinterpret them. Or the court could have decided that the jury might disregard any attempted curative instructions and simply believe their own interpretations of the photographs. As Arizona held, that decision is for the trial court to make and not for us to second-guess.
 
 
 83
 Accordingly, the panel voted to affirm the district court and deny the stay.
 
 
 84
 On Monday, July 17, the same day that defendants' retrial began, defense counsel moved for Reconsideration of Stay en banc. After the jury was empaneled, the prosecution began presenting its case on Tuesday, July 18. This afternoon, four days into the trial, and presumably while the jury is in the midst of hearing testimony, our court granted the stay, immediately enjoining the state court proceeding.
 
 II.
 
 85
 On this record, the only way for the majority to reach the conclusion that it does is for it to disregard Arizona v. Washington. In Arizona, notwithstanding that the trial court made no express finding of "manifest necessity," did not consider the available alternatives to mistrial, and did not articulate on the record its reasons for declaring a mistrial, the Supreme Court held that the trial court's grant of a mistrial was properly within its discretion because the grounds for the court's ruling were apparent from the record. Arizona is directly controlling in the instant case because it, like this case, did not involve prosecutorial misconduct, but rather improper conduct on the part of defense counsel. In Arizona, the mistrial was declared because of improper opening statements by defense counsel; in the case sub judice, the mistrial was declared because of defense counsel's prejudicial error. And, in both cases, a federal court on habeas review substituted its judgment for that of the trial court in deciding whether a mistrial was properly granted. Arizona confirms the illegitimacy of second-guessing a state court finding by a federal court on habeas review following conviction, and a fortiori on extraordinary motion during the actual trial of the case in state court.
 
 
 86
 Arizona stressed that "there are especially compelling reasons for allowing the trial judge to exercise broad discretion in deciding whether or not 'manifest necessity' justifies a discharge of the jury." 434 U.S. at 509, 98 S.Ct. at 832. Significantly as it bears upon the error committed by the majority in the instant case, the Court explained:
 
 
 87
 [T]he extent of the possible bias cannot be measured, and ... the District Court was quite correct in believing that some trial judges might have proceeded with the trial after giving the jury appropriate cautionary instructions. In a strict, literal sense, the mistrial was not "necessary." Nevertheless, the overriding interest in the evenhanded administration of justice requires that we accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected by the improper comment.
 
 
 88
 Id. at 511, 98 S.Ct. at 833 (emphasis added). The Court went on to hold specifically that the absence of a finding of "manifest necessity," the failure to articulate the reasons for the mistrial, and the failure to consider alternatives to mistrial explicitly, did not render the trial court's mistrial order invalid, id. at 501-03, 516, 98 S.Ct. at 828-29, 835-36, and that the essential inquiry, rather, is whether the trial court acted "irrationally or irresponsibly" in granting the mistrial, id. at 514-15, 98 S.Ct. at 835.
 
 
 89
 Not only does the court today ignore the clear command of Arizona to accord the trial court the widest discretion in its finding of a mistrial, it does so in a way and as to an issue that renders its decision nothing short of remarkable. In order for it to grant this stay, the court disregards the finding of fact by the state trial court that the improper submission of the photographs was prejudicial, see Amended Order of May 15, 1995, at 4-5, it disregards the same finding of fact by the federal district court, see Order at 5, and it--as an appellate court--makes the particular finding that there likely is no basis for finding the photographs prejudicial.
 
 
 90
 It would be hard to imagine a decision that is more appropriately committed to the trial court's discretion, and therefore effectively immune from extraordinary equitable federal appellate review, than whether photographs improperly placed before the jury were in fact unduly prejudicial. This is the quintessential discretionary decision, appropriately all but unreviewable by an appellate court on extraordinary motion, if not on appeal following final conviction. Most of the members of the court have not even had an opportunity to see the photographs in question. We do not have the photographs in our possession, and few of us even have reproductions of them. We certainly do not appreciate the various ways in which the photographs may be used by the respective parties. Unlike the trial court that has heard this case from its inception, we have no understanding whatsoever of the prosecution's case or the defense strategy. And it goes without saying that we have no idea of the substantive context (insofar as the unfolding of the trial is concerned) in which these photographs came before the jury.
 
 
 91
 The Supreme Court held in Arizona, where the prejudice from improper opening statements by defense counsel was at issue--an issue indistinguishable from the issue before us, in terms of the capacity for meaningful review by a federal appellate tribunal--that we must rely upon the state trial courts for such fact-intensive determinations. In the face of this clear holding, we should at the very least abstain from engaging in the kind of fact-finding engaged in by the majority in the course of finding that the trial court may have acted irrationally in declaring a mistrial.
 
 III.
 
 92
 If the directives of Arizona v. Washington were not alone sufficient to require that we stay our hand in this matter, then the unmistakable command of Younger v. Harris should be.[12] Younger v. Harris announced a bedrock principle that, absent "extraordinary circumstances," federal courts should not enjoin pending state criminal proceedings. 401 U.S. at 53-54, 91 S.Ct. at 755. Younger is not simply an interesting exhortation; it is grounded in "the basic doctrine of equity jurisprudence that courts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law" and, more importantly, it is grounded in considerations of comity, "born of ... Federalism." Id. at 43-45, 91 S.Ct. at 751. Since Younger, the principle of judicial abstention has been extended to include state civil litigation, see, e.g., Huffman v. Pursue, Ltd., 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987), and even state administrative proceedings, see, e.g., Middlesex County Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982); Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc., 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986). But this case does not implicate either of these extensions. This case rests at the very core of the original Younger holding--a federal appellate court stay of an ongoing state criminal proceeding.
 
 
 93
 The majority believes--despite the contrary conclusion in Younger--that such a stay is appropriate. Some federal courts admittedly have held, usually obliquely, that double jeopardy challenges can be exempt from the prohibition of Younger.[13] But these cases generally address claims of prosecutorial misconduct. Regardless of their wisdom in that context, in the instant case there is no allegation of prosecutorial misconduct or bad faith. The mistrial was brought about by defense counsel's own inadvertence.
 
 
 94
 That the prophylactic shield of the "manifest necessity" doctrine is unnecessary where, as here, the primary danger of prosecutorial misconduct and manipulation that it seeks to prevent is already absent, is brought into sharp relief by Divans v. California, 439 U.S. 1367, 99 S.Ct. 39, 58 L.Ed.2d 75 (Rehnquist, Circuit Justice 1978). In Divans, then-Justice Rehnquist denied a motion to stay a criminal proceeding because there was no allegation of bad faith and the prosecution's "error resulting in the court's mistrial declaration was not intentionally committed by the prosecution for the purpose of provoking applicant's mistrial request." Id. at 1367, 99 S.Ct. at 39. If the fact that the precipitating error by the prosecution was not committed in bad faith is determinative for denying a stay of a criminal proceeding, then surely the fact in the instant case that the error was not the prosecution's at all--but was the defendants'--should be similarly decisive. This is precisely the kind of situation contemplated in Wade v. Hunter, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949), when the Court observed that, "a defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments."
 
 IV.
 
 95
 Given the express findings of prejudice by both the state trial court and federal district court, and the obvious soundness of these judgments when measured against an abuse-of-discretion standard, a federal appellate court has no business injecting itself on this issue mid-trial, especially given that there is no suggestion of misconduct by the prosecution or the court and the error is conceded to be that of the defense. Given the deference we are required to accord the state judicial process under Younger v. Harris, our assumption of power is all the more unjustified.
 
 
 96
 At bottom, the majority simply disagrees with the trial court's assessment of the prejudice caused by defense counsel's mistake in placing the unadmitted photographs before the jury. However, whether the trial court was correct, or whether we would have done it differently, are not the proper questions, as Arizona makes plain: "The interest in orderly, impartial procedure would be impaired if [trial courts] were deterred from exercising th[eir] power [to declare mistrials in appropriate cases] by a concern that any time a reviewing court disagreed with [the court's] assessment of the trial situation a retrial would automatically be barred." 434 U.S. at 513, 98 S.Ct. at 834. The question is whether the trial court's action was irrational or irresponsible. As even defense counsel was forced to concede at argument, this, it most assuredly was not.
 
 
 97
 We should be under no illusion but that the court's stay of this ongoing state criminal trial, unless vacated on appeal, sets the stage for the full release--without even a trial--of three individuals that have been charged by the State with the heinous offenses of murder and lynching. The law does not require this injustice, and indeed, forbids it.
 
 
 98
 DONALD RUSSELL, WIDENER, WILKINSON, and NIEMEYER, JJ., join this dissent.
 
 
 99
 * * * * *
 
 
 100
 The foregoing portion of this opinion was released on Thursday afternoon, along with this court's order staying the ongoing state criminal trial. I do not hereby amend the foregoing portion of my opinion, in which a number of my colleagues join, because I do not believe it appropriate to do so after the district court has proceeded upon our order. I write briefly here on my own behalf to record the events that have transpired since our unprecedented action last Thursday staying the State's murder trial and to express my concern over the conduct before this court of the Attorney General of South Carolina, the Solicitor, and the officials charged with the prosecution of this case.
 
 
 101
 When the en banc court stayed the ongoing criminal proceedings on Thursday, four days into the trial, the State of South Carolina had a right to an immediate appeal of that decision to the Chief Justice, sitting as Circuit Justice. Pursuant to customary Fourth Circuit practice, the en banc order and accompanying opinions had already been forwarded to the Supreme Court. When the en banc order was issued, it was accompanied by two lengthy and emphatic dissents, and three more dissents followed shortly thereafter. Nevertheless, the prosecution declined to appeal.
 
 
 102
 At 3:00 p.m. on Friday, the federal district court began what devolved into an eight-hour hearing on the double jeopardy claim. Shortly before midnight, the district court granted a writ of habeas corpus, barring the trial of the three defendants in this case. No opinion has yet to issue from the district court explaining its decision.
 
 
 103
 Within minutes of that decision, the state trial court, acting on the order of the federal district court, called in the sequestered jury and released the jurors pending further notice.
 
 
 104
 Again, the State had the right to seek in this court an immediate stay of the district court's decision and of the impending release of the three accused murderers. Of course, had the en banc court denied that stay, the State would again have had a right to an immediate appeal to the Chief Justice. Inexplicably, the prosecution again declined to petition either this court or the Chief Justice for emergency relief from the extraordinary writ issued by the district court.
 
 
 105
 Thus, not even in the face of the imminent release into the South Carolina public, without trial, of these three defendants charged by the State with the heinous offenses of murder and lynching, did the Attorney General, Solicitor, or the individual prosecutors seek a stay of the remarkable decisions that caused this injustice--either in this court or in the Supreme Court of the United States. This, despite the fact that these state officials sought the mistrial in the state court, and defended the need for the mistrial before the federal district court, before a panel of this court specially convened to hear the appeal, before the entire court sitting en banc to hear this extraordinary motion, and before the federal district court on remand. And this, despite the fact that the trial court's discretionary decision to declare a mistrial garnered the support of five members of this court in five separate dissenting opinions to this court's order of stay, which carefully detailed the potential prejudice suffered by the prosecution and the importance of the necessary discretion afforded the trial court in order to preserve the integrity of its proceedings.
 
 
 106
 Perhaps there are other reasons for the State's incomprehensible decisions not even to seek to vacate our en banc stay of the state trial or to stay the district court's grant of the writ of habeas corpus, but I can think of only three reasons the State might countenance the federal court's intrusion into the affairs of its courts, much less acquiesce in the release of these murder defendants into the citizenry of South Carolina. Either the State does not believe that this prosecution is meritorious--on either its substantive merits or because of the bar of double jeopardy--in which case the State proceeded in bad faith before this court and the federal district court. Or it was cowered by this court's order, issued without majority opinion, into thinking that in fact retrial of the defendants would be barred by the Double Jeopardy Clause. Or the decision whether to prosecute this case faithfully has become ensnared within the prosecutorial apparatus, in state, local, or perhaps even personal politics. I can think of no other reason for the State's unfathomable decision not even to challenge these federal decisions, each of which completely usurped the sovereign power of the State of South Carolina and effectively ordered the outright release of three murder defendants, without trial, upon the citizens of the State.
 
 
 107
 If there is another explanation for what appears to be this complete abdication of responsibility by these officials, then it is incumbent upon these officials to provide it to the court. Whether or not these officials owe any explanation to the people of South Carolina or are otherwise accountable to the people of that State, they are accountable as officers of the court for their actions in connection with the proceedings before us. If the prosecutors intend to pursue this murder prosecution, they have an obligation to do so zealously; if, for whatever reason, they do not intend to fully represent the interests of the State of South Carolina in this prosecution, then they should dismiss the indictments. As it now stands, the State, because of its passivity, has left the impression that the integrity of the proceedings before the courts of this Circuit has been seriously compromised in this matter of utmost importance.
 
 
 
 [1]
 Set 1 contains the seven photographs at issue. At oral argument before this court, the State suggested for the first time that it was not clear from the record whether the photographs referred to as Set 1 were actually the ones presented to Officer Counts. Although this fact had not previously been disputed, even if the State were correct that these are different photographs, the analysis of the appropriateness of the mistrial and temporary relief remain the same
 
 
 [2]
 The state trial judge did not make a finding of manifest necessity or a finding of prejudice. Indeed, he did not use the word "prejudice" during this proceeding. Further, the state trial judge gave no hint of what prejudice might possibly exist from which a reviewing court could conclude that "prejudice" resulted
 
 
 [3]
 Judge Luttig writes that the state trial judge "explained in detail why he rejected the alternative of a curative instruction or a recall of the witness to allow defense counsel to introduce the photographs." Actually, the state trial judge never addressed the obvious alternative of recalling the witness to the stand other than to state "[w]hile the defendants claim the photographs would have been introduced later, this is speculative and conjectural." Saying that something is "speculative and conjectural" does not make it so. The State does not dispute that Officer Counts was available and that had the defense been allowed to recall him to the stand as it specifically requested, the photographs would have been admitted and marked as exhibits, just like the photographs in Sets 2 and 3
 
 
 [4]
 There is no question concerning the propriety of federal habeas consideration of the petition given the procedural posture. As discussed at length in the magistrate judge's report and recommendation, Petitioners are in custody and have exhausted their state remedies. A federal habeas court is the only forum in which Petitioners may attempt to protect their double jeopardy right not to be tried twice for the same offense. And, it should be noted that there is no suggestion that Petitioners have not proceeded in as timely a manner as possible in bringing this issue before the court
 
 
 [5]
 Under Blackwelder, whether a preliminary injunction should be granted depends upon an analysis of four factors: (1) the likelihood of irreparable harm to the party requesting relief if the preliminary injunction is denied; (2) the likelihood of harm to the party opposing relief if the preliminary injunction is granted; (3) the likelihood that the party requesting relief will succeed on the merits; and (4) the public interest. See Direx Israel, Ltd. v. Breakthrough Medical Corp., 952 F.2d 802, 812 (4th Cir.1991). A court should examine each of these factors sequentially, determining whether, and to what degree, each factor weighs in favor of the party requesting relief. Id. at 812-14. With specific reference to the likelihood of success on the merits, it is not necessary for the party requesting relief to prove that it would prevail on the merits; at most, it is only necessary to show that success is probable. See id. at 813. And, as the likelihood of irreparable harm to the party requesting relief increases, the burden of showing likelihood of success on the merits decreases. Id. at 812-13
 The decision of the district court to grant or deny injunctive relief is to be subjected to "careful scrutiny" to determine whether the lower court committed an abuse of discretion. Id. at 814-15. Underlying findings of fact are to be reviewed for clear error, while conclusions of law are to be reviewed de novo. See id. And, we review the finding of irreparable harm for clear error. Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 552 (4th Cir.1994).
 
 
 [6]
 My research has failed to disclose a single case in which a trial court has granted a mistrial merely because admissible evidence was inadvertently presented to the jury without its formal admission
 
 
 [7]
 In addition, any suggestion that these photographs were inadmissible has been laid to rest by the subsequent proceedings in the ongoing second state trial
 
 
 [8]
 At another point in argument before this court, in response to a question from the panel concerning whether the state trial judge would have committed reversible error if he had refused to admit the photographs had the defense moved their admission, the State represented that although the failure to admit the photographs would have been error, it might not have been reversible error because the photographs were cumulative of the other photographs of the scene
 
 
 [9]
 Judge Luttig writes that "the State emphatically presses the Younger issue." In all of the submissions by the State, I cannot find where it ever used the word "abstain" or referred to Younger. As support for the claim that the State did in fact make such an argument, Judge Luttig points to the State's citation of Sparks v. Garrison, 446 F.Supp. 649 (M.D.N.C.1978). However, the State referred to Sparks only to support its contentions that a finding that Petitioners were unlikely to prevail on the merits justified a refusal to enjoin the state proceedings and that the public interest did not favor the granting of temporary relief. See Respondents' Response to Motion for Reconsideration of Stay En Banc at 12-13, 18. It is abundantly clear that the State did not rely on Sparks for the proposition that, pursuant to Younger, this court should abstain from exercising jurisdiction in this matter. Indeed, the State has given no indication whatsoever that it intended by its citation to Sparks to invoke principles of Younger abstention: the State does not refer to Younger itself, or to abstention in general, and does not provide a parenthetical explanation of the significance of Younger to the decision in Sparks
 
 
 [10]
 In his discussion of the appropriateness of a federal court granting a stay of state criminal proceedings, Judge Luttig cites Divans v. California, 439 U.S. 1367, 99 S.Ct. 39, 58 L.Ed.2d 75 (Rehnquist, Circuit Justice 1978). He notes that in Divans then-Justice Rehnquist denied an application for a stay of state criminal proceedings because the error that had prompted the decision of the state court to grant a mistrial was not intentionally caused by the prosecutor. Judge Luttig appears to assert that because there is no allegation of prosecutorial misconduct here, a stay is not warranted. As then-Justice Rehnquist's earlier opinion rejecting a prior application of a stay of Divans' state criminal proceedings makes plain, the trial judge had granted a mistrial in response to Divans' motion. See Divans v. California, 434 U.S. 1303, 98 S.Ct. 1, 54 L.Ed.2d 14 (Rehnquist, Circuit Justice 1977). When a defendant moves for and is granted a mistrial, the only circumstance in which he can properly claim that retrial following the grant of the mistrial will violate his double jeopardy right is to show that bad-faith, overreaching, or misconduct on the part of the prosecutor or the court led to the motion. Id. at 1303-04, 98 S.Ct. at 1 (citing United States v. Dinitz, 424 U.S. 600, 611, 96 S.Ct. 1075, 1081-82, 47 L.Ed.2d 267 (1976)). It is not surprising that then-Justice Rehnquist found the lack of prosecutorial misconduct to be dispositive of the appropriateness of a stay under those circumstances because Divans could not make a colorable showing that the retrial would violate his double jeopardy rights. In sharp contrast, because the mistrial in Petitioners' state proceedings was granted over their objection, rather than in response to their motion, they need not make any showing of prosecutorial bad faith in order to demonstrate a colorable claim of a double jeopardy violation
 
 
 [11]
 We also note that the Anti-Injunction Act, 28 U.S.C.A. Sec. 2283 (West 1994), is no bar to the granting of a stay. Section 2283 directs that we may not grant a stay of state court proceedings "except as expressly authorized by Act of Congress, or where necessary in aid of [our] jurisdiction, or to protect or effectuate [our] judgments." The federal habeas corpus statute specifically authorizes a stay of state court proceedings. See 28 U.S.C.A. Sec. 2251 (West 1994)
 
 
 [12]
 It is doubtful that the State, in a technical sense, can "waive" the Younger prohibition. Cf. Swisher v. Brady, 438 U.S. 204, 213 n. 11, 98 S.Ct. 2699, 2705 n. 11, 57 L.Ed.2d 705 (1978) (exercising discretion to decline to consider the Younger issue because the State voluntarily submitted to the federal forum). In any event, in this case the State emphatically presses the Younger issue. Resp'ts-Appellees Resp. to Mot. for Stay at 18 ("As in Sparks v. Garrison [, 446 F.Supp. 649 (M.D.N.C.1978), aff'd 612 F.2d 1310 (4th Cir.1979) (denying request for federal intervention in a state criminal proceeding on Younger grounds) ], the extraordinary circumstances justifying federal court interference of state criminal proceedings have not been shown.")
 
 
 [13]
 See, e.g., Gully v. Kunzman, 592 F.2d 283, 286-87 (6th Cir.), cert. denied, 442 U.S. 924, 99 S.Ct. 2850, 61 L.Ed.2d 292 (1979); Jackson v. Justices of Superior Court of Mass., 549 F.2d 215, 216 n. 1 (1st Cir.), cert. denied, 430 U.S. 975, 97 S.Ct. 1666, 52 L.Ed.2d 370 (1977); Foster v. Murphy, 686 F.Supp. 471, 474 (S.D.N.Y.1988). But see Rasmussen v. White, 502 F.Supp. 237, 240 (E.D.Tex.1980) ("The mandate of Younger is broad and clear; federal courts are not to interfere with pending state criminal actions absent a strong showing of bad faith, harassment, or other extraordinary circumstances. The mere fact that a petitioner raises a double jeopardy claim does not, by itself, raise the implication that the prosecution is conducted in bad faith to harass the petitioner, or that extraordinary circumstances are present."); Evans v. Court of Common Pleas, 1990 WL 223071, at * 13 (E.D.Pa.1990) ("[T]his Court holds that a claim of double jeopardy, without more, is insufficient to overcome principles of federalism which dictate respect for the authority and ability of state courts to protect constitutional rights in the first instance."), aff'd 959 F.2d 1227 (3d Cir.1992), cert. dismissed, --- U.S. ----, 113 S.Ct. 1071, 122 L.Ed.2d 498 (1993)